**STATE of Missouri,
Plaintiff/Respondent,**

v.

**Paul Wesley MCCURRY–BEY,
Defendant/Appellant.**

**No. ED 91275.**

Missouri Court of Appeals,
Eastern District,
Division Four.

Dec. 1, 2009.

Loyce Ann Rhodes Hamilton, St. Louis, MO, for Appellant.

Chris Koster, Attorney General, Daniel Neal McPherson, Assistant Attorney General, Jefferson City, MO, for Respondent.

*OPINION*

MARY K. HOFF, Judge.

Paul Wesley McCurry–Bey (Defendant) appeals from the trial court's judgment and sentence imposed after a jury found him guilty of one count of first-degree statutory rape, in violation of Section 566.032, one count of first-degree statutory sodomy, in violation of Section 566.062, and one count of incest, in violation of Section 568.020.[1] After finding Defendant was a persistent offender, the trial court sentenced him to concurrent terms of twenty years for the rape conviction, twenty years for the sodomy conviction, and five years for the incest conviction.

---

1. All subsequent statutory citations are to RSMo 2000, unless otherwise indicated.

On appeal, Defendant asserts the trial court erred in finding him competent to stand trial and to be sentenced. We reverse the trial court's judgment because the preponderance of the evidence established Defendant was not competent to stand trial, and we remand for the entry of a mistrial and an order committing Defendant to the Department of Mental Health (DMH) until such time he is found to be competent.

*Factual and Procedural Background*

At trial, Defendant testified that he did not commit the offenses in this case and was living in a residential drug and alcohol abuse treatment facility when they were committed. Defendant testified that the rules of the facility prohibit a resident from having contact with family members while staying at the facility. Defendant also testified that he went to El Paso, Texas, as part of the facility's treatment program, around the time the offenses were committed. The State presented rebuttal evidence discrediting Defendant's testimony and alibi. Following the close of all evidence and argument by counsel on both sides, the jury found Defendant guilty on all counts.

After trial, the trial court set a date for Defendant's sentencing. At the sentencing hearing, Defendant's attorney (Defense Counsel) asked the trial court to delay sentencing and to order an evaluation of Defendant, pursuant to Section 552.020, to determine whether Defendant was competent to stand trial and to be sentenced. Defense Counsel informed the trial court that he had just learned from Options for Justice that Defendant had an IQ of only 55 and was moderately mentally retarded. In addition, Defense Counsel claimed that

Defendant was "very good at masking his symptoms" and that there was "a very real chance [Defendant] did not understand when [Counsel] explained to him the possible rebuttal evidence that the State had to show his alibi wasn't actually accurate." At the sentencing hearing, the director of Options for Justice informed the trial court that Defendant's school records indicated he had an IQ of 55 when he was sixteen years old. At the time of trial and the competency hearing, Defendant was forty years old.

Following discussion with Defense Counsel and the State, the trial court expressed its surprise with the possibility that Defendant was not competent. Nonetheless, the trial court deferred sentencing and entered an order committing Defendant to DMH for an evaluation of his competency to stand trial.

Two licensed psychologists, Dr. Richard Scott (Dr. Scott) and Dr. Michael Armour (Dr. Armour), subsequently evaluated Defendant. The doctors filed reports with the trial court and testified at a hearing regarding Defendant's competency.[2] Both psychologists have been considered experts in forensic psychology in numerous jurisdictions.

Dr. Scott, who was appointed by the DMH, and a licensed forensic psychologist since 1992, reviewed the records from the underlying case, Defendant's school records, Defendant's medical records, and records of Defendant's legal history. Dr. Scott interviewed and tested Defendant twice for a total of approximately four to four and one-half hours. Dr. Scott opined, within a reasonable degree of psychological certainty, that Defendant was mildly mentally retarded. Dr. Scott's testing of

---

**2.** The reports of the examinations, made pursuant to Section 552.020.3, and containing the doctors' detailed findings and opinions were not filed as part of the record with this Court.

Defendant's IQ resulted in a full-scale score of 55, the bottom of the mildly mentally retarded range, which matched the IQ score from Defendant's school records from twenty-five years prior to trial. Dr. Scott found that Defendant confused legal terms, used technical or defined terms out of context, and spoke about the legal process in a concrete, simplistic manner. Dr. Scott testified that he had not reviewed the transcript of Defendant's trial testimony, particularly concerning Defendant's alleged alibi, but that Defendant's ability to reason was significantly impaired to the point he was rendered unable to assist Defense Counsel, and no amount of education about the legal system would improve Defendant's ability to reason and to understand the proceedings.

Dr. Armour, who was retained by the State, and a certified forensic psychologist with the DMH for 22 years, interviewed Defendant, reviewed the records from the underlying case, copies of Defendant's school records, and an excerpt of Defendant's trial testimony. Dr. Armour opined, within a reasonable degree of psychological certainty, that Defendant was mildly mentally retarded. Dr. Armour's testing of Defendant's IQ resulted in a verbal score of 58, which was close to the score from Defendant's school records. Dr. Armour testified that mental retardation, and attendant "intellectual impairment," is a chronic and consistent condition. Dr. Armour further testified that Defendant could not describe the nature of any of the charges in the underlying case, initially thought the alleged victim was the mother of the actual victim, and thought the judge's role was to help him. Defendant could not explain the meaning of "guilty" and "not guilty" or the concept of rebuttal evidence. Dr. Armour testified that, although it was possible for a mentally retarded individual to assist in his defense, Defendant did not have the ability to understand the legal process. Dr. Armour did not believe Defendant was over-exaggerating his symptoms or malingering and evaluated Defendant for malingering in two ways: (1) by examining Defendant's educational history, including his previous IQ score compared to his current IQ score; and (2) by testing Defendant with the validity indicator profile, which was a tool used to assess the degree of effort Defendant put forth on the test.

The State did not present rebuttal evidence, and the trial court took the matter under submission.

Later, the trial court entered its order finding Defendant competent to stand trial. The trial court acknowledged the opinions of Dr. Scott and Dr. Armour but indicated that a number of facts persuaded the trial court against accepting the doctors' conclusions:

> First, [Defendant's] very experienced and able counsel, never suspected [Defendant] did not understand the proceedings nor believed that [Defendant] was not providing the assistance one would expect of an accused. Second, the Court's own observations of the trial confirm the fact that [Defendant] did indeed assist in his own defense: he testified and provided an alibi. Third, the fact that [Defendant], in the immediate wake of the guilty verdicts, began the process of attacking those verdicts on the basis of his retardation suggests a degree of guile inconsistent with the proposition that he was incapable in assisting in his defense. Fourth, [Defendant] has had many previous experiences with the Court system, and this suggests that there may have been some malingering in his responses to Dr. Scott and Dr. Armour.

> This is a very difficult and vexing issue, among the most difficult that the

judge through whom the Court is now speaking has had to decide in the almost 13 years he has served on the bench.

Relying heavily on these observations of Defendant, the trial court concluded Defendant was competent to stand trial and to be sentenced. This appeal followed.

### Standard of Review

The trial court's ruling on a defendant's competency is a factual determination that must be upheld unless there is no substantial evidence to support it. *State v. Anderson*, 79 S.W.3d 420, 433 (Mo. banc 2002); *State v. Tilden*, 988 S.W.2d 568, 576 (Mo.App. W.D.1999). The appellate court does not weigh the evidence but accepts as true all the evidence and reasonable inferences that tend to support the trial court's findings. *Anderson*, 79 S.W.3d at 433.

### Discussion

■ On appeal, Defendant claims the trial court erred and violated his Constitutional right to due process by finding him competent to stand trial and to be sentenced because the uncontroverted evidence showed that Defendant was mentally retarded with a present full-scale IQ of 55, consistent with his school records and history, and that his chronic and consistent mental deficits rendered him incapable of making intelligent, knowing decisions about his legal proceedings and incapable of generating ideas that would refute the State's evidence or would mitigate his sentence.[3] We agree.

■ The issue of competence is not waived once trial begins. *Tilden*, 988 S.W.2d at 577. "[A] court must confront and determine the issue at whatever stage of the trial it may arise." *Id., quoting State v. Clark*, 546 S.W.2d 455, 468 (Mo. App.1976). Section 552.020.2 provides, in pertinent part:

> Whenever any judge has reasonable cause to believe that the accused lacks mental fitness to proceed, he shall, upon his own motion or upon motion filed by the state or by or on behalf of the accused, by order of record, appoint one or more private psychiatrists or psychologists ... to examine the accused.

■ The standard for competence to stand trial is whether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and has a rational as well as factual understanding of the proceedings against him. Section 552.020.3; *Drope v. Missouri*, 420 U.S. 162, 172, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); *Edwards v. State*, 200 S.W.3d 500, 519 (Mo. banc 2006) (internal quotation marks omitted). The defendant is presumed competent to stand trial, and he bears the burden of showing that he is incompetent. Section 552.020.8; *Anderson*, 79 S.W.3d at 432–33.

The State argues the trial court correctly found Defendant competent to stand trial and to be sentenced by relying on its own observations of Defendant during trial to find that Defendant failed to carry his burden of proving, by a preponderance of the evidence, he was incompetent. In support of its contention that a trial court's own observations and appraisal of a defendant's mental state is "determinative" on the issue of competency to proceed, the State cites to *State v. Elam*, 89 S.W.3d 517 (Mo.App. W.D.2002), and *State v. Garrett*,

---

**3.** Defendant presents two points on appeal. In his second point, Defendant claims the trial court abused its discretion in overruling his objection to certain testimony concerning the victim's statements and behavior because the testimony constituted improper bolstering of the victim's testimony. Given our disposition of this case, we need not address Defendant's second claim of error.

595 S.W.2d 422 (Mo.App. S.D.1980). The State argues that based on these two cases, the trial court, in this case, was entitled to rely upon its own observations of Defendant and to disregard the opinions of Dr. Armour and Dr. Scott in finding Defendant competent to stand trial. We find *Elam* and *Garrett* distinguishable from the instant case.

In *Elam*, the defendant was given a preliminary psychiatric evaluation to determine his mental competency to stand trial. 89 S.W.3d at 520. A psychiatrist evaluated and diagnosed the defendant with "schizoaffective disorder, bipolar type," and, as a result of his disorder, he was unable to understand the legal proceedings against him or assist in his own defense. *Id.* On that basis, the trial court found the defendant incompetent to stand trial and committed him to the DMH. Several months later, two DMH psychologists evaluated the defendant and determined that his mental condition had improved and that he should remain on his medication but opined that he was nonetheless able to understand, appreciate the significance of, and participate in the proceedings and, therefore, competent to proceed to trial. *Id.* at 522. The defendant was subsequently evaluated by a fourth psychiatrist who concurred with the first psychiatrist's diagnosis and also added that the defendant suffered from paranoid schizophrenia. *Id.* at 520. The fourth psychiatrist opined that the defendant's ability to fully understand the proceedings was limited and that his ability to give reasonable assistance to his attorney would be "challenged." *Id.*

At the competency hearing, in addition to the evidence of all four experts' opinions, the State presented the testimony of a police officer who had witnessed the defendant's conduct during a prior suppression hearing. *Id.* at 520–21. The police officer saw the defendant smile during one expert's testimony that the defendant was incompetent but also saw the defendant glare when the trial court denied the motion to suppress. *Id.* at 521. The trial court thereafter found the evidence presented at the competency hearing together with the trial court's own observations refuted any allegation that the defendant was unable to assist in his defense, thus, he was competent to proceed to trial. *Id.* The trial court further found the defendant had been "articulate and aware of his circumstances" and had become "involved beyond the usual in the defense of [this] case" despite the fact that he had not taken his medication for over a year. *Id.* at 523. On appeal, the Western District affirmed, reasoning that the trial court's observations in addition to the opinions of two of the four psychologists and the police officer's observations of the defendant supported the trial court's findings. *Id.*

In *Garrett*, the defendant was already serving a prison sentence for murder when he was charged and convicted for a second murder. 595 S.W.2d at 425–26. The defendant filed a motion requesting a mental examination after the trial concluded but before sentence was imposed. The trial court denied the defendant's request based, in part, on its observations of the defendant during the proceedings. *Id.* at 433. On, appeal, the Southern District affirmed, reasoning that the record revealed, "[u]ntil the motion in question, there was no suggestion of incompetency to proceed" and the trial court "could have concluded the motion [requesting a mental examination] was the result of [defendant's] personal strategy." *Id.* at 434.

In *Elam*, the trial court weighed conflicting evidence, particularly the conflicting reports of the four psychologists and the observations of the police officer, then utilized its own observations to draw its

own conclusions. In *Garrett*, the trial court did not have before it any evidence of prior incompetence. In contrast, the trial court here disregarded *both* the opinions of the DMH-appointed expert and the State's expert *and also* the prior evidence of Defendant's school history and previous IQ score, all of which weighed against a finding of competency, in favor of its own observations to find Defendant competent to proceed. Given the record before us, we find Defendant proved by a preponderance of the evidence that he did not have a sufficient present ability to consult with Defense Counsel with a reasonable degree of rational and factual understanding of the proceedings against him. Defendant's point is granted.

### Conclusion

We reverse the trial court's judgment that Defendant was competent to stand trial and be sentenced and remand for the entry of a mistrial and an order committing Defendant to the MDH until such time as he is found competent to proceed.

NANNETTE A. BAKER, Chief Judge and KATHIANNE KNAUP CRANE, Judge, Concur.