

# In the Missouri Court of Appeals
# Eastern District

### DIVISION ONE

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED103366 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of the City of St. Louis |
| vs. | ) | 0822-CR06876-01 |
| | ) | |
| CALVIN BROWN, | ) | Honorable John F. Garvey, Jr. |
| | ) | |
| Appellant. | ) | Filed: January 31, 2017 |

Calvin Brown ("Defendant") appeals the judgment entered after a bench trial convicting him of first-degree murder and armed criminal action for his alleged role in knowingly causing the death of his grandmother Clara Little ("Grandmother") on November 11, 2008, by stabbing her and cutting her throat through the knowing use, assistance, and aid of a dangerous instrument. Because we find the trial court committed reversible error in denying Defendant's pre-trial motion for a continuance, we reverse and remand for a new trial.

### I.      BACKGROUND

Defendant was charged with the above crimes on November 12, 2008. In large part due to the repeated concerns of Defendant's attorneys and trial judges as to whether Defendant had a mental illness that rendered him incompetent to proceed to trial, this case has a lengthy procedural posture, with multiple trial judges presiding over the case.[1]

---

[1] Multiple trial judges presided over Defendant's case because the criminal assignment judge for Division 16 of the 22nd Judicial Circuit changed from year-to-year.

**A.      Events Which Occurred Prior to Defendant's Pre-Trial Motion for a Continuance**

The following events occurred prior to Defendant's pre-trial motion for a continuance. Defendant's family attempted to hire private counsel for Defendant, but he refused to talk with counsel and his family did not have the necessary funds. At the request of Defendant's family, an attorney from the Missouri State Public Defender's Office ("Public Defender's Office") submitted the necessary paperwork for Defendant to be represented. After Defendant was found to be eligible for services from the Public Defender's Office, a public defender briefly entered her appearance for Defendant and Defendant, by and through counsel, entered a plea of not guilty. Subsequently, the original public defender withdrew her appearance and public defender Srikant Chigurupati ("Mr. Chigurupati") entered his appearance for Defendant on February 25, 2009.

On April 26, 2010, the Honorable Steven R. Ohmer ("Judge Ohmer") issued an order for a mental health evaluation pursuant to section 552.020 RSMo 2000[2] to determine if Defendant was competent to proceed to trial. Because Defendant refused to participate in an outpatient mental health evaluation, Judge Ohmer issued an order on June 11, 2010 committing Defendant to Fulton State Hospital ("Fulton") for an inpatient mental health evaluation pursuant to section 552.020 RSMo 2000.

Defendant subsequently participated in an inpatient mental health evaluation with Dr. Jeffrey Kline ("Dr. Kline"), a licensed psychologist and certified forensic examiner at Fulton. On August 31, 2010, Dr. Kline issued a written report in which he concluded:

---

[2] Section 552.020.2 RSMo 2000 requires a judge to order a mental health evaluation of an accused "[w]henever [the] judge has reasonable cause to believe that the accused lacks mental fitness to proceed." Additionally, section 552.020.1 RSMo 2000 provides that: "[n]o person who as a result of mental disease or defect lacks capacity to understand the proceedings against him or to assist in his own defense shall be tried, convicted or sentenced for the commission of an offense so long as the incapacity endures." Section 552.020 was amended twice in 2011, with the second amendment effective August 28, 2011. *See* section 552.020 RSMo 2012. Although section 552.020 RSMo 2012 applies to the trial judges' orders and defense counsels' requests for a mental health evaluation which occurred on or after August 28, 2011, the 2011 amendments to the statute do not change the aforementioned quoted language of the statute, and therefore, they are non-substantive for purposes of this appeal.

It is clear that [Defendant's] current delusional beliefs would severely interfere with his capacity to comprehend advice by counsel, participate in planning his defense, or reasonably appraise outcomes and implications of plea bargains or other issues involving his case . . .. [I]t is clear that [Defendant] lacks the capacity to understand the proceedings against him and lacks the capacity to assist in his own defense as a result of his mental disease or defect, [p]sychotic [d]isorder [n]ot [o]therwise [s]pecified.

Based on Dr. Kline's August 31, 2010 report, which was filed with the court, Judge Ohmer entered an order on October 12, 2010 finding Defendant was not competent to proceed to trial and committing Defendant to the custody of the Missouri Department of Mental Health ("Department of Mental Health").

Due to Defendant's continuing lack of cooperation with health care personnel at Fulton who were attempting to complete an updated evaluation of Defendant's mental condition, the Honorable John F. Garvey, Jr. ("Judge Garvey") entered an order on June 22, 2011 authorizing Dr. Kline to interview witnesses in Defendant's case. Although Defendant was generally uncooperative in his interviews with Dr. Kline, Dr. Kline issued a report dated July 15, 2011 concluding it was unlikely Defendant was still suffering from a mental disease or defect and that Defendant was no longer incompetent to understand the proceedings against him or to assist in his defense. Based on Dr. Kline's July 15, 2011 report, which was filed with the court, Judge Garvey issued an order on August 15, 2011, (1) finding Defendant was competent to proceed to trial; and (2) ordering Defendant to be discharged from the Department of Mental Health and returned to the City of St. Louis Justice Center for criminal proceedings to be resumed.

On December 7, 2011, Defendant's counsel, Mr. Chigurupati, filed a motion to again have Defendant evaluated for competency pursuant to section 552.020 RSMo Supp. 2012,[3] alleging "[D]efendant continue[d] to exhibit behavior that makes him seem incompetent." The Honorable

---

[3] All further references to section 552.020 are to RSMo Supp. 2012, which incorporates amendments through 2011 and is the latest version of the statute.

Philip D. Heagney ("Judge Heagney") held a hearing on the motion on February 23, 2012. Defendant was initially present at the hearing, but he was escorted out of the courtroom after he would not respond to any of Judge Heagney's questions. A deputy sheriff with the City of St. Louis Sheriff's Office who had transported Defendant to court hearings, Mr. Chigurupati's supervisor, and Dr. John Rabun ("Dr. Rabun") testified at the February 2012 hearing. The deputy sheriff testified he witnessed Defendant refuse to answer any questions from Mr. Chigurupati and his supervisor. Mr. Chigurupati's supervisor testified she had concerns Defendant was not competent to proceed to trial, in part because she observed him urinating in front of her and "go from screaming wildly to laughing." Finally, Dr. Rabun testified he had attempted to interview Defendant two times, at the request of the defense, to evaluate Defendant's competency and responsibility pursuant to section 552.020 and section 552.030 RSMo Supp. 2012,[4] but he was unable to conduct those evaluations because Defendant would not come out of his cell and refused to participate. At the conclusion of the hearing, Judge Heagney agreed Defendant should again be evaluated for competency, and on March 5, 2012, Judge Heagney issued an order for another mental health evaluation pursuant to section 552.020 to determine if Defendant was competent to proceed to trial.

On May 22, 2012, Drs. Rachael Springman and Bridget Graham, licensed psychologists with the Department of Mental Health, advised Judge Heagney that Defendant would not cooperate in an outpatient mental health evaluation and requested Defendant be hospitalized at Fulton to undergo an inpatient mental health evaluation. Judge Heagney ordered Defendant to be returned to Fulton, and Dr. Kline again attempted to evaluate Defendant. Dr. Kline issued a report dated August 10, 2012, finding in relevant part, "[Defendant] refused to speak to the examiner during the

---

[4] All further references to section 552.030 are to RSMo Supp. 2012, which incorporates amendments through 2011 and is the latest version of the statute. Section 552.030.1 provides that: "[a] person is not responsible for criminal conduct if, at the time of such conduct, as a result of mental disease or defect such person was incapable of knowing and appreciating the nature, quality, or wrongfulness of such person's conduct."

course of his current examination . . . There is no evidence that [Defendant] is currently suffering from a mental disease or defect that would interfere with his capacity to understand the proceedings against him or his capacity to assist in his own defense." Based on Dr. Kline's August 10, 2012 report, which was filed with the court, Judge Heagney entered an order on August 31, 2012 finding Defendant was competent to proceed to trial.

On September 11, 2012, Defendant's counsel, Mr. Chigurupati, filed a motion to withdraw himself and the entire Public Defender's Office from Defendant's case. The motion alleged Defendant would not cooperate or communicate with Mr. Chigurupati, and therefore, counsel was unable to effectively represent Defendant. Judge Heagney conducted a hearing on the motion to withdraw on October 18, 2012. At the hearing, Defendant responded to some of Judge Heagney's questions, informing the judge he did not have or need a lawyer to represent him, he did not want to represent himself, and he did not want to participate in his trial. Judge Heagney subsequently issued an order on January 30, 2013 denying Mr. Chigurupati's motion to withdraw.

The next day, public defender Mary Fox ("Ms. Fox") filed a request for leave to substitute her appearance as counsel for Defendant and to withdraw the appearance of Mr. Chigurupati because he was leaving the Trial Division of the Public Defender's Office. The trial court granted the motion.

On February 11, 2013, Ms. Fox filed a motion requesting a hearing on Defendant's behalf pursuant to section 552.020, alleging she believed Defendant was not competent to proceed to trial. The motion set out the lack of contact between Defendant and all of his assigned attorneys, specifically alleging that since Mr. Chigurupati's entry of appearance in February 2009, Defendant had only met with Mr. Chigurupati one time other than when he had been brought to court.

The Honorable Bryan L. Hettenbach ("Judge Hettenbach") granted Ms. Fox's motion to have Defendant evaluated for competency under section 552.020, and Judge Hettenbach conducted

5

a competency hearing on March 5, 2013. Defendant did not attend the hearing, and Ms. Fox told the court she had never been able to talk to Defendant because he refused to speak with her at all of her attempted visits. In addition, Dr. Kline and Mr. Chigurupati testified at the March 2013 hearing. Dr. Kline testified about the report issued in August 2010 where he found Defendant was not competent and the reports issued in July 2011 and August 2012 where he found Defendant was competent. During his testimony, Dr. Kline admitted Defendant cooperated most in his evaluation which led to the first, August 2010 report, and that was the only time Dr. Kline had received detailed information regarding Defendant's mental state. Mr. Chigurupati testified that during the four years he was Defendant's attorney, Defendant refused all visits except for one, and even then he was not willing to talk about his case. After the March 2013 hearing, Judge Hettenbach entered an order finding Defendant competent to proceed to trial.

Subsequently, on March 15, 2013, Ms. Fox filed a Notice of Intent to Rely on Defense of Mental Disease or Defect Excluding Responsibility, and Judge Hettenbach ordered an examination of Defendant pursuant to section 552.030.[5] However, Defendant refused to speak to the examiner (Dr. Kline) or participate in the evaluation, and therefore, Dr. Kline submitted a report to the court dated June 14, 2013 stating he had insufficient evidence to determine if Defendant had a mental disease or defect excluding him from responsibility for killing his Grandmother. Based upon those facts, Ms. Fox filed a notice of her intent to withdraw her reliance upon the defense. The notice alleged Ms. Fox was requesting a continuance of the trial and should the continuance be granted, she may renew her intent to rely on the defense of mental disease or defect excluding responsibility.

The record reflects that prior to trial, some of the trial judges assigned to Defendant's case and some of the doctors who Defendant refused to participate in evaluations with expressed

---

[5] Section 552.030 requires a court order a mental health evaluation of an accused when, *inter alia*, he has given written notice of his purpose to rely on the defense of mental disease or defect excluding responsibility and the State has not accepted the defense. Section 552.030.3; *see also* section 552.030.2.

concerns that Defendant might be feigning symptoms of a mental illness. On October 31, 2013, Defendant's case was assigned to Judge Garvey in Division 17 of the 22nd Judicial Circuit,[6] for a jury trial to be held on November 12, 2013.

## B. Defendant's Motion for a Continuance and his Waiver of his Right to a Jury Trial

In a written motion filed on November 7, 2013, Ms. Fox requested a continuance on Defendant's behalf so she could consult with Defendant as to his wishes how to proceed in the case because both she and Mr. Chigurupati had been unable to communicate with Defendant at any time during their representation of Defendant. Ms. Fox's motion also requested a further competency evaluation. After holding a hearing, the trial court denied the motion.[7] Subsequently, Ms. Fox brought it to the court's attention that Defendant had paper wadded up in his ears, which Ms. Fox alleged could be a sign of auditory hallucinations.

Defendant then informed the court he wished to waive his right to a jury trial, because he had concerns that members of the jury might be on the payroll and because he preferred to have one person judge him instead of thirteen. The trial court extensively questioned Defendant, and after Ms. Fox expressed concerns that she believed Defendant was not competent, Defendant denied having a mental illness. The trial court then accepted Defendant's waiver of his right to a jury trial, and the case proceeded to a bench trial on November 12, 2013.

## C. Evidence Adduced at Defendant's Bench Trial

The following evidence was adduced at Defendant's bench trial. Defendant's paternal Grandmother lived at an apartment located at 4012 Cora in the City of St. Louis with Defendant and her two sons, Lonnie Little ("Lonnie"), who is Defendant's uncle, and Calvin Little ("Calvin"), who

---

[6] Unless otherwise indicated, all further references to the "trial court" or "court" are to Judge Garvey.
[7] The specific allegations in Defendant's motion for a continuance and the trial court's stated reasons for denying the motion will be set out in relevant part in Section II.B. of this opinion.

is Defendant's father.[8] On November 11, 2008, Veteran's Day, Lonnie and Calvin were in the living room of the apartment on Cora watching television with their friend Carl Hadley ("Mr. Hadley"), while Defendant's Grandmother was in her bedroom watching television. After hearing a loud knocking at the front door, Mr. Hadley let Defendant into the apartment. Defendant then stormed through the living room and into his Grandmother's bedroom.

Once in his Grandmother's bedroom, Defendant asked his Grandmother a question about a framed photograph on her wall, which was from 1972 and showed her, an African-American woman, receiving an award at her place of employment from a Caucasian man in a military uniform. The photograph had been on the wall of Defendant Grandmother's apartment for the fifteen years she had lived there and had also hung on the wall of her previous home. Defendant took the photograph off the wall and asked his Grandmother if she was the woman in the picture, and Grandmother responded that it was. Upon hearing that response, Defendant tore the photograph and hit his Grandmother in the face so hard it knocked her out. Lonnie and Calvin heard the attack and attempted to stop Defendant, but Defendant pushed them both down and ran into the kitchen where he grabbed two knives. Defendant then came out of the kitchen and threatened his uncle Lonnie and father Calvin with the knives, telling them, "I'll skin you like a turkey." At that point, Lonnie, Calvin, and Mr. Hadley ran outside the apartment and neighbors called the police.

Subsequently, Defendant came out of the apartment, took off his gloves and a shirt, threw them in a trash can, and walked away. Lonnie and Calvin went back into the apartment and approached Defendant's Grandmother's body, which was on the floor of the bedroom. Her throat had been cut to the point that her head was almost decapitated and a knife was stuck in her back.

---

[8] Because Lonnie and Calvin Little share the same last name, we will refer to them by their first names for clarity and ease of reading.

Despite Defendant's actions, Lonnie described the relationship between Defendant and his Grandmother as "very good," and Lonnie testified Defendant had no complaints with his Grandmother and had not been involved in any arguments with her. Calvin testified Defendant was his Grandmother's favorite grandson, and Calvin described Defendant as a respectful young man who helped his Grandmother on a regular basis. The week prior to the killing, Lonnie had observed Defendant acting "unusual," sitting outside in the cold, naked and wrapped in a cover. Lonnie believed that on the day Defendant killed his Grandmother, Defendant had simply gone "beserk" and "crazy." Similarly, Calvin testified that on the day the crimes occurred, Defendant was not acting like the son he knew.

Police took Defendant into custody after locating him on the front steps of his maternal grandfather's house located at 909 Walton in the City of St. Louis, which is about a thirty-to-forty minute walk away from Defendant's paternal Grandmother's apartment on Cora. Officers then transported Defendant to his Grandmother's apartment where Lonnie and Calvin identified Defendant as the person who killed his Grandmother. When Detective Jimmy Hyatt ("Detective Hyatt") told Defendant he had just been identified by his uncle and father as the person who killed his Grandmother, Defendant told Detective Hyatt he did not know the people who identified him, laughed, and said, "my grandmother's been dead in my eyes." Detective Hyatt characterized Defendant's behavior as strange and calm. Officers seized boots from Defendant's person, a wash cloth from the crime scene, and gloves and a shirt from the trash can outside of the apartment. A subsequent DNA analysis determined that Defendant's Grandmother's blood was on all of those items.

Ms. Fox called two witnesses on behalf of the defense, Mary Brown ("Ms. Brown"), who is Defendant's aunt, and Dr. Kline, who issued reports in August 2010, July 2011, and August 2012 evaluating Defendant's competency. Ms. Brown testified that on the date of the crimes, Defendant

9

was at his maternal grandfather's house on Walton for the entire day, until he said he was going to take a walk to the corner store. Dr. Kline testified he opined in his August 2010 report that Defendant was suffering from a psychotic disorder not otherwise specified, i.e., psychosis, in part because during Defendant's interview preceding the report, Defendant was delusional, laughing, having auditory or visual hallucinations, and thinking there was a conspiracy against him. Dr. Kline also testified one of the main reasons he was unable to make a diagnosis as to whether Defendant was suffering from psychosis on November 11, 2008, the date of the his Grandmother's killing, was that Defendant did not respond to evaluation questions.

After hearing the above evidence, the trial court entered a verdict finding Defendant guilty of first-degree murder and armed criminal action.

## D. Post-Trial Procedural Posture Including Defendant's Competency Hearing and Sentencing

After the trial court entered its verdict, Ms. Fox made a motion requesting the court to conduct a competency examination to determine if Defendant had been competent to proceed at his trial. The trial court granted Ms. Fox's motion and entered an order requiring the Department of Mental Health to conduct a mental health evaluation of Defendant pursuant to section 552.020. Three doctors evaluated Defendant after the trial and testified at a post-trial competency hearing, which was held on November 10, 2014 and May 6, 2015; Dr. Springman and Dr. Richard Scott testified on behalf of the defense and Dr. Michael Armour testified on behalf of the State.

Drs. Springman and Scott, both licensed psychologists and certified forensic examiners with the Department of Mental Health at the Metropolitan St. Louis Psychiatric Center, reviewed Defendant's records and interviewed Defendant four times between December 26, 2013 and March 4, 2014. Defendant participated in all four sessions, and Drs. Springman and Scott determined Defendant was not malingering, feigning his mental illness, or attempting to exaggerate symptoms of a mental illness during his interviews. After their evaluations of Defendant, both doctors opined

10

Defendant suffered from a mental disease in the form of a delusional disorder of a persecutory type. This diagnosis is consistent with Dr. Kline's pre-trial, August 2010 diagnosis, which concluded Defendant suffered from a psychotic disorder not otherwise specified, because delusional disorder of a persecutor type is a specific type of psychotic disorder. Dr. Springman testified that although a person suffering from delusional disorder of a persecutory type can have conversations with others and present himself as being lucid, it still causes someone to suffer from fixed beliefs that are irrational, implausible, and not able to be reasoned with.

Dr. Springman further testified Defendant would place tissue in his ears because he believed it would prevent others from monitoring his conversations. Drs. Springman and Scott also testified Defendant's delusional disorder and resulting paranoia and inability to make rational decisions impacted his ability to assist his attorneys in his own defense in a number of ways. Specifically, the doctors testified Defendant's delusional disorder and resulting symptoms caused him not to meet with his attorneys during the several years before trial, in part because Defendant had the delusional belief that Mr. Chigurupati was working with the prosecution and Defendant was also suspicious of Ms. Fox. Approximately five to six months before his trial, Defendant began taking Seroquel, an anti-psychotic medication. Dr. Springman's and Dr. Scott's testimony indicated it was the continuous and repeated administration of this medicine that changed Defendant's behavior and caused him to be willing to cooperate and engage with them as evaluators.

Based upon their review of Defendant's records and their evaluations of Defendant, Drs. Springman and Scott both opined within a reasonable degree of psychological certainty that Defendant was not competent to proceed with his trial in November 2013 as a result of his delusional disorder. The doctors specifically testified Defendant lacked the capacity to understand the proceedings against him and he was unable to assist in his own defense because he was unable to rationally consider his legal options, make decisions about his case, or work with his attorneys in

11

preparing or executing a defense.  Drs. Springman and Scott further testified that after reviewing the records in Defendant's case, there was no apparent or rational reason for Defendant to harm his Grandmother in November 2008, and there was a substantial amount of information suggesting he was mentally ill at the time of the crime.  Although Dr. Scott had not formed a written opinion or done a specific evaluation as to whether Defendant was mentally ill when he killed his Grandmother, Dr. Scott testified he believed that as a result of Defendant's mental illness, Defendant was unable to take advantage of a defense of mental disease or defect excluding responsibility when he went to trial in November 2013.

Dr. Armour, a clinical psychologist who testified at Defendant's post-trial competency hearing on behalf of the State, reviewed Defendant's records and interviewed Defendant two times in May and June 2014.  Defendant participated in both sessions, though Defendant had placed tissue in his ears during the interviews.  Like Drs. Springman and Scott, Dr. Armour opined Defendant suffered from a mental disease in the form of a delusional disorder of a persecutory type.  Similarly, Dr. Armour, (1) determined Defendant was not malingering; (2) opined nothing Defendant had done was a concerted effort to fake or fool the court or justice system; and (3) specifically testified Defendant did not cause his delusions.  Dr. Armour also testified it was possible Defendant had a delusional disorder of a persecutory type at the time of the crimes in November 2008, which could result in the possibility of a defense of mental disease or defect excluding responsibility.

In contrast to Dr. Springman's and Dr. Scott's opinions, Dr. Armour opined that despite Defendant's mental disease, Defendant was competent to proceed at his November 2013 trial, and he had the ability to aid and assist in his defense and cooperate with Ms. Fox at the time of his trial. Dr. Armour's conclusion was based in part on Defendant informing him that while he did not trust Mr. Chigurupati, Defendant worked with Ms. Fox during the trial by writing out questions to her and making comments to her about what he believed were weak points in the State's case.  On

12

cross-examination, Dr. Armour admitted, (1) that at the time of his report, he did not know Defendant refused to meet with his attorneys for approximately four years prior to trial; (2) refusing to meet with an attorney prior to trial was either an irrational or poor decision on Defendant's part; (3) a delusional disorder can impact a person's decision making ability; and (4) it was "definitely possible" Defendant's delusions could have impacted his decision-making process which resulted in his failures to meet and consult with his attorneys and the doctors in his case. Dr. Armour further testified that Defendant's taking of Seroquel was the one factor that would explain why he cooperated with evaluators after trial.

At the conclusion of the post-trial competency hearing and in response to some of Dr. Armour's testimony, Ms. Fox stated on the record Defendant never provided her with any information that allowed her to present him with a good defense or advice. Thereafter, the trial court found Defendant was competent to proceed at the time of his trial[9] and set the case for

---

[9] This Court notes that we can find no Missouri case where a trial court held a post-trial competency hearing and then retroactively determined the defendant's competency to proceed in his previously-held trial. Despite the rarity of such a procedure, nothing in the plain language of section 552.020 appears to prohibit such a procedure from taking place, *see* section 552.020, and "there is no per se rule against such." *State v. Lee*, 660 S.W.2d 394, 398 (Mo. App. S.D. 1983) (quoting *State v. Carroll*, 543 S.W.2d 48, 51 (Mo. App. 1976)). The U.S. Supreme Court "has recognized the hazards of retrospective competency hearings" and found a post-trial competency hearing to determine a defendant's competency to proceed in his previously-held trial was not appropriate on remand where, (1) a defendant was absent during a portion of the trial due to a self-inflicted wound, and therefore, neither the judge nor counsel was able to observe him during that portion of the trial; or (2) the post-trial competency hearing would be held more than a year after the defendant's trial. *Lee*, 660 S.W.2d at 398 (quoting *Carroll*, 543 S.W.2d at 51); *see Drope v. Missouri*, 420 U.S. 162, 182-83 (1975) (defendant absent during portion of trial); *Pate v. Robinson*, 383 U.S. 375, 387 (1966) (post-trial competency hearing would be held six years after defendant's previously-held trial); *Dusky v. U.S.*, 362 U.S. 402, 403 (1960) (post-trial competency hearing would be held more than one year after defendant's previously-held trial). After giving consideration to some of those aforementioned U.S. Supreme Court holdings, Missouri appellate courts have ordered a post-trial competency hearing to determine a defendant's competency to proceed in a previously-held trial to take place on remand under circumstances where such a hearing would safeguard the interests of a defendant. *Lee*, 660 S.W.2d at 398 (implicitly considering *Drope* and *Pate*) and *Carroll*, 543 S.W.2d at 51, 51 n.4 (explicitly considering *Drope* and *Pate*); *see also State v. Bolden*, No. ED102965, 2016 WL 7106291 at *1, 5 (Mo. App. E.D. Dec. 6, 2016) (application for transfer filed in the Missouri Supreme Court on Jan. 25, 2017) (explicitly considering *Pate* and ordering a post-trial competency hearing to take place on remand under circumstances where, *inter alia*, the defendant underwent a competency examination at the time of the court's pre-trial determination of whether he could proceed pro se).

13

sentencing.

On August 20, 2015, the trial court entered a judgment in accordance with its verdict and sentenced Defendant to life imprisonment without the possibility of probation and parole for first-degree murder and to three years of imprisonment for armed criminal action, with the sentences to run concurrently. This appeal followed.

## II.    DISCUSSION

Defendant raises three points on appeal. In his first point on appeal, he asserts the trial court committed reversible error in denying his pre-trial motion for a continuance. Because we agree and find this point is dispositive of Defendant's appeal, it is unnecessary for us to address Defendant's second and third points on appeal.[10]

### A.    General Standard of Review

Whether to grant or deny a motion for a continuance is a decision that is within the sound discretion of the trial court. *State v. Litherland*, 477 S.W.3d 156, 163 (Mo. App. E.D. 2015). "Nevertheless, whether a trial court committed reversible error in denying a motion for a continuance is determined by considering the circumstances of each case." *Id*. The trial court's denial of a motion for a continuance will be reversed only if there is a strong showing the court abused its discretion and that the moving party was prejudiced as a result of the denial of the motion. *Id*. at 163, 165.

### B.    Defendant's Motion for a Continuance and the Trial Court's Denial of the Motion

In a written motion filed on November 7, 2013, Ms. Fox requested a continuance on Defendant's behalf so she could consult with Defendant as to his wishes how to proceed in the case because both she and Mr. Chigurupati had been unable to communicate with Defendant at any time

---

[10] Defendant's second point on appeal contends the trial court erred in allowing Defendant to waive his right to a jury trial, and Defendant's third point on appeal argues the trial court erred in finding Defendant was competent to proceed with his trial.

14

during their representation of Defendant. Ms. Fox's motion also requested a further competency evaluation. The motion alleged Ms. Fox attempted visits with Defendant five times in February, April, May, August, and November of 2013, but Defendant did not come out of his jail cell for any of these visits. Ms. Fox's motion also alleged she corresponded with Defendant four times on March 12, April 4, August 20, and October 3 of 2013, providing Defendant with information and requesting contact with Defendant, but Defendant did not send any return correspondence to Ms. Fox. Ms. Fox alleged it was her belief that Defendant's failure to communicate with her was a result of a mental disease or defect, noting he was diagnosed as having a psychotic disorder not otherwise specified in August 2010 by Dr. Kline. Finally, the motion for a continuance alleged that if the motion were denied and the cause proceeded to trial, Defendant would be denied the right to effective assistance of counsel and due process. In sum, Ms. Fox's motion for a continuance alleged she was not prepared for trial and able to represent Defendant effectively because Defendant refused to communicate with her as a result of him having a mental disease or defect and because Defendant refused to participate in examination to determine if he had a mental disease or defect excluding him from responsibility for killing his Grandmother under section 552.030.

At the hearing on Defendant's motion for a continuance, Defendant told the court he was ready to go to trial, and Ms. Fox told the court she felt she could not provide effective representation for Defendant because she had been unable to have any conversations with him. The trial court then questioned Defendant about his position concerning the need for Ms. Fox to talk with him to develop a defense strategy and his willingness to talk with his counsel:

The court: Do you understand that at trial the State is going to put on evidence, so you have to have some type of strategy between you and Miss Fox as to how you will attack the State's evidence?

Defendant: I understand that.

The court: Miss Fox is your attorney, you understand that?

15

| | |
|---|---|
| Defendant: | Yes, yes. |
| The court: | So in order for her to be competent and to do a good job for you she needs to have an idea of where you want to go on the case and what strategy – |
| Defendant: | Yes, sir. |
| The court: | What she's saying is she has none of that because she has not had an opportunity to talk with you. |
| Defendant: | Yes sir.  Yes, sir. |
| The court: | . . .. [I]f the continuance was granted, would you talk to her? |
| Defendant: | Yes, sir. |

Defendant was then escorted out of the court room and to a holding cell, and Ms. Fox attempted to communicate with Defendant but he refused to do so.

With the proceedings back on the record, the trial court then denied Defendant's request for a continuance, finding:

> [A]fter questioning, [D]efendant's lucid and articulate manner in which he addressed the [c]ourt, his pledge to the [c]ourt that he would be consulting with his attorney during the trial, the history of [D]efendant [ ] – although it is sprinkled with references to psychosis and his inability to participate in the process, the [c]ourt balances that now with his lucidity, and all evidence of competency at this stage, and his pledge to the [c]ourt that he would cooperate with his attorney.  For all those reasons the [c]ourt is going to deny [D]efendant's motion for continuance.

Subsequently, Ms. Fox brought it to the court's attention that Defendant had failed to communicate with her before the trial court made its ruling and that Defendant had paper wadded up in his ears, which Ms. Fox alleged could be a sign of auditory hallucinations.

## C.      Whether the Trial Court Abused its Discretion in Denying Defendant's Motion for a Continuance

We first examine whether the trial court abused its discretion in denying Defendant's motion for a continuance.  "An abuse of discretion occurs when a trial court's decision is clearly against the logic of the circumstances then before it and is so arbitrary and unreasonable as to shock the sense

16

of justice and indicate a lack of careful consideration." *Id.* at 163 (quotations omitted). In determining whether a trial court has abused its discretion in denying a defendant's motion for a continuance, Missouri Courts have considered several factors including the implication of a defendant's constitutional rights, the seriousness of the offense charged, the nature of any potential defense defendant claims he was unable to prepare for and present at trial, and whether counsel had ample opportunity to prepare for trial. *State v. Schaal*, 806 S.W.2d 659, 666 (Mo. banc 1991) (whether counsel had ample opportunity to prepare); *State v. Jackson*, 130 S.W.2d 595, 596 (Mo. 1939) (seriousness of offense charged); *State v. Kauffman*, 46 S.W.2d 843, 844-46 (Mo. 1932) (seriousness of offense charged and nature of defense); *Litherland*, 477 S.W.3d at 165 (implication of defendant's constitutional rights and seriousness of the offense charged).

As aptly stated by this Court in *Litherland*, we "recognize[ ] the importance of cases being decided as efficiently as possible and the importance of justice being served to victims, their families, and society as a whole." 477 S.W.3d at 165. However, those principles should not override a defendant's constitutional rights to have a reasonable opportunity to consult with counsel and to prepare and present a defense, especially in a case such as this where a Defendant is defending a serious charge of first-degree murder subject to a sentence of life imprisonment without the possibility of probation or parole. *See id.* (similarly finding and citing to *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) and section 565.020.2 RSMo 2000); *see also State v. McDonald*, 343 S.W.2d 68, 71 (Mo. 1961) (in accordance with due process, "a defendant charged with a serious crime . . . is entitled to the assistance of counsel . . . includ[ing] the opportunity reasonably to consult with counsel and to prepare a defense"); *Jackson*, 130 S.W.2d at 596 (describing first-degree murder as a "serious crime").

With respect to the factor relating to the nature of any potential defense Defendant claims he was unable to prepare for and present at trial, the circumstances of this case are similar to those in

17

*State v. Kauffman*, 46 S.W.2d 843. In *Kauffman*, the defendant was charged with the serious offense of first-degree murder, and his potential defense was insanity. *Id*. at 844, 846. The Missouri Supreme Court held the trial court abused its discretion in denying the defendant's motion for a continuance where counsel reasonably required more time to properly prepare the defense, defendant was deprived of a right to adequately prepare an insanity defense, and more time was required for examination and observation of the defendant before a conclusion could be reached as to his mental condition. *Id*. at 845-46; *see also State v. Riley*, 394 S.W.2d 360, 364 (Mo. 1965) (similarly describing *Kauffman*).

Here, similar to the potential insanity defense and charge in *Kauffman*, Defendant claims he was unable to prepare for and present the defense of mental disease or defect excluding responsibility in defending the serious charge of first-degree murder. Although we recognize whether a defendant is competent to proceed to trial under section 552.020 and whether he is responsible for his criminal conduct under section 552.030 are distinct issues,[11] questions as to Defendant's competency provide a relevant backdrop to examining the issue of Defendant's responsibility under the circumstances of this case. Defendant's attorneys had repeated concerns as to whether he had a mental illness throughout the proceedings in this case, as evidenced by their numerous requests for competency evaluations. Similarly, the multiple trial judges presiding over this case had repeated concerns as to whether Defendant had a mental illness from as early as April 2010 to as late as post-trial, as evidenced by their numerous orders of mental health evaluations pursuant to section 552.020. *See* section 552.020.2 (requiring a judge to order a mental health

---

[11] *Compare* section 552.020.1 ("[n]o person who as a result of mental disease or defect lacks capacity to understand the proceedings against him or to assist in his own defense shall be tried, convicted or sentenced for the commission of an offense so long as the incapacity endures"), *with* section 552.030.1 ("[a] person is not responsible for criminal conduct if, at the time of such conduct, as a result of mental disease or defect such person was incapable of knowing and appreciating the nature, quality, or wrongfulness of such person's conduct").

18

evaluation of an accused "[w]henever [the] judge has reasonable cause to believe that the accused lacks mental fitness to proceed").

In February 2012, Dr. Rabun testified he had attempted to interview Defendant two times, at the request of the defense, to evaluate his responsibility pursuant to section 552.030, but he was unable to conduct an evaluation because Defendant would not come out of his cell and refused to participate. On March 15, 2013 Ms. Fox filed a Notice of Intent to Rely on Defense of Mental Disease or Defect Excluding Responsibility, and Judge Hettenbach ordered an examination of Defendant pursuant to section 552.030. However, Defendant again refused to speak to the examiner (Dr. Kline) or participate in the evaluation, and therefore, Dr. Kline submitted a report to the court dated June 14, 2013 stating he had insufficient evidence to determine if Defendant had a mental disease or defect excluding him from responsibility for killing his Grandmother. Based upon those facts, Ms. Fox filed a notice of her intent to withdraw her reliance upon the defense, but the notice indicated the withdrawal was only tentative in that it alleged Ms. Fox may renew her intent to rely on the defense of mental disease or defect excluding responsibility if the trial court granted her motion for a continuance. Ultimately, the record reveals Defendant's attorneys were unable to prepare for and present the defense of mental disease or defect excluding responsibility because Defendant failed to communicate with his attorneys and failed to participate in mental health evaluations with doctors.[12]

In sum, Defendant's mental state was repeatedly questioned by Defendant's attorneys and the multiple trial judges presiding over this case and there was no expert opinion given before or during the trial as to whether Defendant was responsible for killing his Grandmother as a result of a having a mental disease or defect. Under these circumstances, we find that Ms. Fox reasonably

---

[12] See our analysis in Section II.D.1. below, where we address the State's argument that to the extent Defendant's attorneys were unable to prepare for trial and present a defense of defense of mental disease or defect excluding responsibility, it was Defendant's fault.

required more time to properly prepare the defense of mental disease or defect excluding responsibility, Defendant was deprived of a right to adequately prepare such a defense, and more time was required for examination and observation of Defendant before a conclusion could be reached as to his mental condition at the time of his conduct leading to the charges in this case. *See Kauffman*, 46 S.W.2d at 845-46 (similarly concluding).

Moreover, Defendant's attorneys, both Mr. Chigurupati and Ms. Fox, did not have an ample opportunity to prepare for trial because it is undisputed they were completely unable to discuss Defendant's case with him prior to trial – a fact which was apparent to the trial court considering the pre-trial record in this case including the allegations in Defendant's motion for a continuance and the trial court's questions at the hearing on the motion. *See State v. King*, 375 S.W.2d 34, 38 (Mo. 1964) ("if the appellant had been unable to advise with his attorneys, that fact would have been apparent prior to th[e] da[y] [before the setting for his trial]"); *cf. State v. Blades*, 928 S.W.2d 371, 373 (Mo. App. S.D. 1996) (finding defense counsel has an ample opportunity to prepare to represent a defendant at trial where he has been fully able to discuss the case with defendant).

Based on the foregoing discussion concerning the implication of Defendant's constitutional rights, the seriousness of Defendant's first-degree murder charge, the potential defense of mental disease or defect excluding responsibility which Defendant's attorneys were unable to prepare for and present at trial, and defense counsels' lack of an ample opportunity to prepare for trial, we hold the trial court abused its discretion in denying Defendant's motion for a continuance under the circumstances of this case. *See Schaal*, 806 S.W.2d at 666; *Jackson*, 130 S.W.2d at 596; *Kauffman*, 46 S.W.2d at 844-46; *Litherland*, 477 S.W.3d at 165.

**D.      Whether Defendant Was Prejudiced By the Denial of his Motion for a Continuance**

In order to find the trial court committed reversible error in denying Defendant's motion for a continuance, we must also find Defendant was prejudiced as a result of the denial of the motion.

*Litherland*, 477 S.W.3d at 163, 165. A defendant is prejudiced from the denial of a motion for a continuance if granting the continuance could have affected the outcome of the case. *See id*. at 166; *see also State v. Wendleton*, 936 S.W.2d 120, 123 (Mo. App. S.D. 1996).

1.       **The State's Argument that Defendant Essentially Caused his Own Prejudice**

We initially address the State's argument that Defendant essentially caused his own prejudice because to the extent Defendant's attorneys were unable to prepare for trial and present a defense of mental disease or defect excluding responsibility, it was Defendant's fault. The State cites two cases in support of its position: *State v. Richardson*, 718 S.W.2d 170 (Mo. App. W.D. 1986) and *State v. Windle*, 615 S.W.2d 563 (Mo. App. S.D. 1981).

In *Richardson*, the defendant moved for a fourth continuance immediately before trial on the bases he wished to obtain substitute counsel and his current counsel was not adequately prepared for trial. 718 S.W.2d at 171. The Western District held the trial court did not abuse its discretion in denying the defendant's motion because he had already been given adequate time to obtain substitute counsel but failed to do so and the defendant refused to cooperate and meet with his current counsel. *Id*. at 171-72.

In *Windle*, the defendant moved for a continuance on the evening before his trial so his newly-hired and substituted attorney could prepare a defense. 615 S.W.2d at 563-65. The Southern District held the trial court did not abuse its discretion in denying the defendant's motion because the defendant hired his new attorney four days before trial, and therefore, "[a]ny complaint of inadequate time for defendant's substituted attorney to prepare his case rests squarely on the shoulders of the defendant." *Id*. at 564-65.

The circumstances of this case can be distinguished from those in *Richardson* and *Windle*. First, in *Richardson* and *Windle* there was no suggestion that the defendants' competency was questioned, and in *Richardson* there was no suggestion that the defendant's refusal to cooperate

21

with his counsel was a result of a mental illness. *See* 718 S.W.2d at 171-74; 615 S.W.2d at 563-65. In contrast, Defendant's competency was repeatedly questioned by his attorneys and the trial judges throughout the proceedings in this case, and there was evidence at the post-trial competency hearing suggesting Defendant's refusal to cooperate with his attorneys was a result of a mental illness.

Additionally, the request for a continuance in this case was not based upon the Defendant's desire to obtain substitute counsel or his conduct in changing attorneys shortly before trial as they were in *Richardson* and *Windle*. *See* 718 S.W.2d at 171; 615 S.W.2d at 563-65. Instead, Ms. Fox requested a continuance on Defendant's behalf so she could consult with Defendant as to his wishes how to proceed in the case because both she and Mr. Chigurupati had been unable to communicate with Defendant at any time during their representation of Defendant. The motion for a continuance also requested a further competency evaluation, and Ms. Fox informed the court she may continue to attempt to pursue to a defense of mental disease or defect excluding responsibility if the continuance was granted.

Finally, we acknowledge the record reflects that some of the trial judges assigned to Defendant's case and some of the doctors who Defendant refused to participate in evaluations with expressed concerns that Defendant might be feigning symptoms of a mental illness prior to trial. However, the undisputed testimony from all three experts at Defendant's post-competency hearing, who actually had the opportunity to evaluate Defendant after he had been on Seroquel for some time and he had cooperated with them, is that Defendant was not feigning symptoms of a mental illness. Specifically, Drs. Springman and Scott determined Defendant was not malingering, feigning his mental illness, or attempting to exaggerate symptoms of a mental illness during his interviews. Similarly, the State's expert, Dr. Armour, (1) determined Defendant was not malingering; (2) opined nothing Defendant had done was a concerted effort to fake or fool the court or justice system; and (3) specifically testified Defendant did not cause his delusions. Under these

22

circumstances, we cannot find it was Defendant's fault that his attorneys were unable to prepare for trial and present a defense of mental disease or defect excluding responsibility.

### 2. Analysis as to Prejudice

In this case, evidence in the record suggests that at the time of Defendant's alleged criminal conduct, and as a result of a mental disease or defect, Defendant was incapable of knowing and appreciating the nature, quality, or wrongfulness of his conduct. *See* section 552.030.1 (finding a person is not responsible for criminal conduct under such circumstances). In other words, evidence in the record suggests that a mental disease or defect could have excluded Defendant from responsibility for killing his Grandmother. *See id.*; *see also* section 552.030.2. Additionally, there is evidence in the record that suggests Defendant could have cooperated with Ms. Fox and evaluators in pursuing the defense of mental disease or defect excluding responsibility.

### a. Evidence Suggesting a Mental Disease or Defect Could Have Excluded Defendant from Responsibility for Killing his Grandmother

First, Dr. Kline's initial, August 2010 report concluded that Defendant had delusional beliefs and was suffering from the mental disease or defect of psychotic disorder not otherwise specified. Not only was the August 2010 report authored by Dr. Kline the one issued closest in time to the November 2008 killing of Defendant's Grandmother, but Dr. Kline admitted during his testimony at trial that Defendant cooperated most in his evaluation which led to August 2010 report, and that was the only time Dr. Kline had received detailed information regarding Defendant's mental state.[13] It is also worth noting that all three of the doctors who testified at Defendant's post-trial competency hearing and evaluated Defendant after his trial, including the State's expert, Dr. Armour, opined Defendant suffered from a mental disease in the form of a delusional disorder of a persecutory type. Additionally, that diagnosis is consistent with Dr. Kline's pre-trial, August 2010 diagnosis, because

_____

[13] In contrast, in Dr. Kline's later evaluations of Defendant which led to his July 2011 and August 2012 reports opining that Defendant no longer had a mental disease or defect, Defendant was either generally or completely uncooperative.

23

delusional disorder of a persecutor type is a specific type of psychotic disorder. We find the preceding evidence suggests Defendant could have been suffering from psychosis at the time of his Grandmother's killing and that a mental disease or defect could have excluded Defendant from responsibility for killing his Grandmother.

Testimony at trial concerning the facts of the offense and Defendant's behavior near and at the time of the killing of his Grandmother also suggests that Defendant could have had a mental disease or defect at the time of his Grandmother's killing which could have excluded Defendant from responsibility for his conduct. The week prior to the killing, Defendant's uncle Lonnie had observed Defendant acting "unusual," sitting outside in the cold, naked and wrapped in a cover. The transcript reveals Defendant's alleged conduct on the day of the killing of his Grandmother was even more unusual. After Defendant stormed through the living room and into his Grandmother's bedroom, he asked his Grandmother if she was the woman on a framed photograph on her wall. The photograph was from 1972 and showed her, an African-American woman, receiving an award at her place of employment from a Caucasian man in a military uniform. A reasonable inference from the evidence is that Defendant was previously aware of the photograph because he lived with his Grandmother, it had been there for the fifteen years she had lived at her apartment, and it had also hung on the wall of her previous home. Nevertheless, when Defendant's Grandmother told him it was in fact her in the picture, Defendant tore the photograph and hit his Grandmother in the face so hard it knocked her out. Defendant proceeded to then grab two knives and threatened his uncle Lonnie and father Calvin, telling them "I'll skin you like a turkey."

After Defendant had been alone with his Grandmother in the apartment and he walked away from the scene, Lonnie and Calvin found Defendant's Grandmother's throat cut to the point that her head was almost decapitated and a knife was stuck in her back. Lonnie and Calvin's testimony indicated that based on Defendant's and Grandmother's prior relationship, which was "very good,"

24

they knew of no reason why Defendant would want to harm his Grandmother. Lonnie testified he believed Defendant had simply gone "beserk" and "crazy" on the day of the killing, and Calvin similarly testified Defendant had not acted like the son he knew. Additionally, when Detective Hyatt told Defendant he had been identified by his uncle and father as the person who killed his Grandmother, Defendant acted strange and calm, telling Detective Hyatt that he did not know the people who identified him, laughing, and saying, "my grandmother's been dead in my eyes."

Evidence adduced at the post-trial competency hearing also indicates Defendant could have had a mental disease or defect at the time of his Grandmother's killing which could have excluded Defendant from responsibility for his conduct. Drs. Springman and Scott, the experts for the defense, testified that after reviewing the records in Defendant's case, there was no apparent or rational reason for Defendant to harm his Grandmother in November 2008, and there was a substantial amount of information suggesting he was mentally ill at the time of the crime. Even the State's expert at the post-trial competency hearing, Dr. Armour, testified it was possible Defendant had a delusional disorder of a persecutory type at the time of the crimes in November 2008, which could result in the possibility of a defense of mental disease or defect excluding responsibility.

In sum, the preceding evidence suggests a mental disease or defect could have excluded Defendant from responsibility for killing his Grandmother.

### b. Evidence Suggesting Defendant Could Have Cooperated with Ms. Fox and Evaluators Had a Continuance Been Granted

Finally, and perhaps most importantly, evidence adduced at the post-trial competency hearing suggests that had the trial court granted Defendant's motion for a continuance, Defendant could have cooperated with Ms. Fox and evaluators to determine whether a defense of mental disease or defect excluded him from responsibility and Defendant could have taken advantage of the defense at trial. Dr. Scott testified he believed that as a result of Defendant's mental illness, Defendant was unable to take advantage of the defense when he went to trial in November 2013.

25

With the exception of Defendant writing out questions to Ms. Fox during the trial and making comments to her about what he believed were weak points in the State's case – information which Ms. Fox told the court did not lead to a good defense or advice – Defendant did not cooperate with Mr. Chigurupati or Ms. Fox prior to or during trial. Additionally, the record reveals that before trial, Defendant cooperated most with doctors in the interview leading up to Dr. Kline's August 2010 report, and after that point Defendant was either generally or completely uncooperative with doctors attempting to perform evaluations until after the trial.

In stark contrast, Defendant complied with Ms. Fox's request to have him evaluated for competency after the trial. And on December 26, 2013, approximately a month and a half after Defendant's November 12, 2013 trial concluded, Defendant participated in his first interview with Drs. Springman and Scott. Defendant continued to participate in three more interviews with Drs. Springman and Scott, and he also participated in two subsequent interviews with Dr. Armour in May and June 2014. Evidence at the post-trial competency hearing demonstrates that the change in Defendant's level of cooperation was due to the fact he had been taking Seroquel, an anti-psychotic medication, since approximately five to six months before his trial. Dr. Springman's and Dr. Scott's testimony indicated it was the continuous and repeated administration of this medicine that changed Defendant's behavior and caused him to be willing to cooperate and engage with them as evaluators post-trial. Similarly, Dr. Armour testified that Defendant's taking of Seroquel was the one factor that would explain why he cooperated with evaluators after trial.

We find the preceding evidence indicates that had the trial court granted Defendant's motion for a continuance, Defendant could have cooperated with Ms. Fox and evaluators to determine whether a defense of mental disease or defect excluded him from responsibility and Defendant could have taken advantage of the defense at trial.

### 3. Conclusion as to Prejudice

Based on the foregoing, the record suggests that had a continuance been granted, Defendant could have introduced expert testimony at trial providing he had a mental disease or defect excluding him from responsibility for his Grandmother's killing. Such testimony would have allowed Defendant to present the defense at trial, would have constituted substantial evidence, and would have caused the trier of fact to make a determination as to the merits of the defense. *See* section 552.030.6 ("[t]he issue of whether any person had a mental disease or defect excluding responsibility for such person's conduct is one for the trier of fact to decide upon the introduction of substantial evidence of lack of such responsibility"); *State v. Moss*, 789 S.W.2d 512, 514-15 (Mo. App. S.D. 1990) (the introduction of expert testimony providing a defendant was suffering from a mental disease or defect excluding responsibility at the time of the crime constitutes substantial evidence entitling a defendant to have a trier of fact make a determination as to the merits of the defense). Under these circumstances, the record shows granting Defendant's motion for a continuance could have led to Ms. Fox adequately preparing for and presenting a defense of mental disease or defect excluding responsibility, and therefore, a continuance could have affected the outcome of the case. Accordingly, we hold Defendant was prejudiced by the denial of his motion for a continuance. *See Litherland*, 477 S.W.3d at 166 and *Wendleton*, 936 S.W.2d at 123 (finding a defendant is prejudiced from the denial of a motion for a continuance if granting the continuance could have affected the outcome of the case).

### E. Conclusion as to the Trial Court's Denial of Defendant's Motion for a Continuance

As we similarly concluded in *Litherland*, "[t]his Court is mindful of the delay in justice to all parties associated with this case, considering many years have passed since the commission of the underlying crimes[.]" 477 S.W.3d at 167. We also recognize the difficult position the trial court was in due to the competing concerns it was confronted with: on the one hand, the court was

27

faced with repeated questions concerning Defendant's competency, which were heightened by Defendant's lack of communication with the court, his counsel, and doctors; and on the other hand, the court was attempting to reach a final disposition and administer justice for a homicide as swiftly as possible. "Of course, speedy trials and prompt execution of the judgments of courts are desirable; but, if the time ever comes when they may be obtained by a disregard of well-established principles of law, then life, liberty, and property will no longer be secure." *State v. Richardson*, 46 S.W.2d 576, 579 (Mo. 1932). As previously indicated, the well-established principles of law implicated in this case include Defendant's constitutional rights to have a reasonable opportunity to consult with counsel and to prepare and present a defense, under circumstances where Defendant was defending a serious charge of first-degree murder and the record reflects that further examination of Defendant's mental state at the time of the crime is warranted. Moreover, because we hold that the trial court abused its discretion in denying Defendant's motion for a continuance under the circumstances of this case and that Defendant was prejudiced as a result of the denial of his motion, the trial court committed reversible error in denying Defendant's motion for a continuance. *Litherland*, 477 S.W.3d at 167. Point one is granted.

### III.  CONCLUSION

The judgment of the trial court is reversed and the case is remanded for a new trial.


_____
ROBERT M. CLAYTON III, Presiding Judge

Mary K. Hoff, J., and
Lisa P. Page, J., concur.

28