

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | WD83422 |
| | ) | |
| MARCUS SIMMS, | ) | Opinion filed:   July 27, 2021 |
| | ) | |
| Appellant. | ) | |

**APPEAL FROM THE CIRCUIT COURT OF CLAY COUNTY, MISSOURI**
**THE HONORABLE JANET L. SUTTON, JUDGE**

Division Three:  Edward R. Ardini, Jr., Presiding Judge,
Mark D. Pfeiffer, Judge and W. Douglas Thomson, Judge

Marcus Simms appeals the convictions entered against him by the Circuit Court of Clay County, Missouri, after a jury trial, for one count of first-degree murder, one count of armed criminal action, and one count of first-degree tampering with a motor vehicle. Simms argues that the trial court abused its discretion in overruling his requests for a trial continuance and mistrial, asserting that he was incompetent to stand trial. He additionally argues that the trial court abused its discretion by allowing the State to repeatedly question him on cross-examination about his attempts—or lack thereof—to help the murder victim, his girlfriend Michelle Boldridge. For the reasons described below, we affirm.

**Factual and Procedural Background[1]**

On the morning of April 30, 2014, Simms, who worked the overnight shift at a grocery store, was driven home by a co-worker. Simms arrived at the apartment he shared with his girlfriend, Michelle Boldridge, at approximately 6:10 a.m. Soon after, Simms stabbed Boldridge repeatedly as she lay prone in a closet. Simms stabbed her in the breast, shoulder, leg, arms, hands, neck, forehead, head, face, and ear, and he removed her right eyeball. The medical examiner determined Boldridge died of a combination of "atlanto-occipital dislocation"—internal decapitation or severing of the spine from the skull—and "multiple sharp-force injuries."

Police were dispatched to the apartment complex at approximately 6:56 a.m. in response to calls that a naked male, "covered in blood," was "running through the parking lots." Officers found Simms's North Kansas City Community Center membership ID card in the parking lot. An officer "ran [Simms's] name" and the computer search "located a report that associated him to a Michelle Boldridge" and revealed their apartment address. Police went to their apartment and observed blood on the door knob. The door was locked, but the officers were able to obtain a key from a maintenance worker and let themselves in.

The officers found Boldridge dead in the closet. The closet door had been closed, and someone had placed a shoebox over her face. Officers also found a bloody, bent knife in the bedroom. Similar knives—although not in the same condition—were found in a kitchen drawer. Officers did not observe signs of a struggle elsewhere in the apartment, nor did they find signs of a home invasion or forced entry. The front door to the apartment, which was locked when officers arrived, could only be locked from the outside with a key.

---

[1] All facts and reasonable inferences derived therefrom are stated in the light most favorable to the verdicts. *See State v. Allred*, 338 S.W.3d 375, 377 (Mo. App. S.D. 2011).

In the kitchen, on a magnetic white board on the refrigerator, there was a note written by Boldridge. The note read: "Not Happy. A relationship is 50/50. Not 90/10. Everyone has dilemmas in life. One person cannot give/pair by themselves. It takes two in my feelings. As usual, tired of being ignored, tired of being stressed/upset. Therapy session for myself. Time to end the many faces of time for honesty."

Tony Howard lived in the same apartment complex as Simms and Boldridge, and usually did not keep his car locked. He went to his car "midday" on April 30, 2014, and found inside Simms's clothes and shoes, blood, and Boldridge's eyeball. The inside of the car had been damaged: "the steering column looked like it was busted open, like someone attempted to start it."

After Simms was unable to start Tony Howard's car, he used Boldridge's keys and drove away in her green Ford Focus.[2] At approximately 7:15 that morning, Scott Hunter—who did not know Simms—opened his garage door to take out the trash and encountered Simms, naked in his driveway. Simms said: "Help me. Help me. They're coming for me. They killed my girlfriend. Can I come in?" Hunter refused to let him in, but advised he would call for help. Hunter backed inside of his garage while Simms lay down in the driveway. Hunter called the police, and went to the front door to observe Simms. Hunter saw him "driving down the street in a small light-green-colored vehicle."

Simms abandoned the Ford Focus near the Liberty Schools bus barn—where school buses were housed—and ran through the bus lot. A bus driver saw Simms and contacted her supervisor, who called 911. Simms found an unlocked Chrysler Town and Country minivan in the bus barn.

---

[2] The car belonged to Boldridge's mother, who had loaned the car to Boldridge the day before.

The keys to the vehicle were "down in the floor board."[3] Simms drove the minivan out of the bus barn.

At approximately 8:05 a.m., police were dispatched to a one-vehicle accident in Parkville, Missouri. Simms had failed to navigate a turn and had driven off the highway and into a field. Officers placed Simms under arrest at the scene and he was taken to the hospital. There, an investigator collected swabs of blood found on Simms. Simms also provided a buccal swab, which was used by investigators to conduct DNA analysis.

Simms's DNA was found in blood on the wall of the closet where Boldridge was killed and in Tony Howard's car. Both Simms's and Boldridge's DNA were present on the bloody, bent knife found in the bedroom. Boldridge's DNA was found in the blood on Simms's left knee.

The State charged Simms with one count of first-degree murder and one count of armed criminal action related to the death of Boldridge, and one count of first-degree tampering for operating the minivan without the owner's consent.

*Trial Continuances and Simms's Competency*

Simms's trial date was originally set for April 18, 2016. At the request of defense counsel, the trial was continued multiple times. In a motion for continuance filed on October 24, 2016, defense counsel advised that she had been "recently diagnosed with Stage III, grade 1 uterine cancer and [was] undergoing chemotherapy and radiation treatment for the same." In a motion filed April 12, 2017, defense counsel advised that she was "three weeks out of treatment and [was] not prepared to start trying cases." In a motion filed July 19, 2017, defense counsel sought a trial continuance "[d]ue to [Simm's] medical and mental condition." In a motion filed February 5, 2018, defense counsel advised that Simms "was indicted on January 30, 2018 for another Murder in the

---

[3] The minivan belonged to Tamara Lee, an employee of the Liberty Public Schools Transportation Department. Lee had left the keys in the vehicle because her daughter intended to use the vehicle that day while Lee was working.

4

First degree charge, allegedly occurring in the Clay County jail," that she had "been trying to get medical records from the Clay County Detention Center since June of 2017, in order to have a mental health evaluation completed," and that she "ha[d] been told for six months that due to an ongoing investigation, they could not release them to defense counsel."

On May 28, 2019, the trial court held a conference call regarding another request to continue the trial. The trial court acknowledged that "the defense [was] wanting a mental exam, but nothing's been done towards that end, yet," so the trial court requested the State initiate the process of having the Department of Mental Health examine Simms. Later that day, the State filed a "Motion for Appointment of Department of Mental Health to Do Examination Under Section 552.020 RSMo." The State requested the trial court order the Department of Mental Health to examine Simms and render an opinion as to his mental fitness to proceed to trial. "Counsel for defense join[ed] in this request." The following day the trial court granted the motion, entered its Order for Psychiatric Examination, and continued the trial date to October 21, 2019.

On September 26, 2019, a mental evaluation report completed by Heather McMahon, Psy.D., was filed with the trial court.[4] Dr. McMahon diagnosed Simms with Unspecified Schizophrenia Spectrum and Other Psychotic Disorder but concluded that he had the capacity to understand the proceedings against him and to assist in his own defense. At an October 2019 status conference, defense counsel "object[ed] to the conclusions in the evaluation and ask[ed] for a hearing."

The trial court conducted a competency hearing on October 11, 2019. Defense counsel objected to the report and provided arguments as to why its findings should not be conclusive:

> Every time I see him in court, Your Honor, and I think you've noticed it, as well, there always seems to be certainly some physical problem.

---

[4] Simms did not include the report by Dr. McMahon in the legal file on appeal.

5

When I try to speak with him . . . he seems more concerned about the people he can't see that are beating him up than wanting to talk about his case.

. . .

And again, just when I try to talk to him, it can be very difficult. He can't speak very loudly. He does seem to understand what I'm saying; I'm not really saying that. However, there does seem to be either some sort of psychological or medical issue with him. He can barely walk.

Yesterday in court I had to help him over, and I would have today, as well, but I think he can hear, and he's probably more comfortable over there in the jury box.

Your Honor, also, it seems like on page 5 of the report . . . that he indicated to the doctor that he sees weird stuff, and that he's confused and in awe because he had not experienced anything similar to this before jail.

He stated that sometimes he sees sometimes [sic] people he knows, sometimes he just sees shadows.

And then the doctor indicates that it's unclear if these reports were the result of a delusional thought process, or if they were actual medical symptoms occurring. Because it's unclear, Your Honor, I think that she cannot give an accurate diagnosis, therefore.

. . .

She's also indicated on page 6 . . . and these are related to some medical mental health records - - that while he's been incarcerated, he has exhibited delusions of others trying to kill him. The jail staff [h]as also interpreted many of his somatic concerns as related to a psychiatric illness, other than a medical one.

And then, if we go down a little bit further, it stated: Since the symptoms have been sporadic and there's not a consistent period of time in which he's reportedly experienced them, the most accurate diagnosis available at this time, again, is unspecified schizophrenia spectrum, and other psychotic disorder.

Your Honor, again, I'm no doctor, and I believe the State believes that he is faking, essentially or is malingering. But if he is trying to hurt himself over and over again, there's clearly something wrong there.

Last week in Division 1 - - actually I believe it was last week in this division, I apologize, just one week ago, he had two black eyes. He could barely open them. . . . [H]e told me that people beat him up and he couldn't see them. That sounds like a mental disease or defect, Your Honor.

6

The other issue I have is, just even if it's a physically medical issue, that he doesn't look right, Judge. He can sometimes not keep his head up straight. He certainly can't walk. I would be worried as to what a jury might think of that, or just assume from that.

Defense counsel advised that she had "another doctor that's again going to see him on the 15th," but she understood that the trial court was "not going to give [her] another continuance unless or until [she] prove[d] that he may be . . . unfit to proceed." No witnesses were called to testify at the hearing. After posing some questions to counsel relating to Simms's medical history, the trial court found Simms competent to proceed to trial:

> THE COURT: If I read the report correctly, he's been taken, on numerous occasions, to Liberty Hospital and no major medical diagnoses have been found, is that correct?
>
> [DEFENSE COUNSEL]: It seems so. I agree with that.
>
> [PROSECUTOR]: Everything seems related to the anal bleeding, according to what I read. They've given him all the care he needed.
>
> THE COURT: But on none of those occasions have they found any, I guess what I would term serious physical illness that anybody's aware of, correct?
>
> [DEFENSE COUNSEL]: Correct.
>
> THE COURT: Is there anything else that you want to present at this time?
>
> [DEFENSE COUNSEL]: There isn't.
>
> THE COURT: As [the State] points out, there was never an NGRI plea entered in this case, so [the] only thing I'm looking at is his competency to proceed. And his competency assessment, as far as his ability to proceed, he was clearly able to indicate everybody's roles, clearly competent as far as understanding the proceedings against him, what his attorney was doing, what his options are. The doctor indicated absolutely no problems with his ability to understand proceedings against him or with his ability to assist in his defense, if he chooses to do so. So at this time, based on these findings, I'm going to find him mentally fit to proceed to trial at this time.

*Trial*

On the first day of trial, prior to jury selection, defense counsel requested a continuance, which was denied by the trial court:

> [DEFENSE COUNSEL]: . . . [B]ased on Mr. Simms' appearance today and what he's been telling me is physically wrong with him today, says that his neck hurts, shoulder hurts, stomach hurts. I think his backside hurts, his legs hurt. He cannot keep his head up, it seems like. At one point just a few minutes ago, his head fell and hit the table. Your Honor, for those reasons I am requesting a continuance this morning.

> THE COURT: Has he made any of those complaints over the weekend and been attended to by any medical staff?

> [DEFENSE COUNSEL]: I'm not sure. I tried to go see him yesterday. I was told that he could not walk and therefore refused the visit. It's - - the jail has apparently told him that if he refused to walk or cannot walk, they will count that as a refusal of a visit.

> Mr. Simms, have you been to the hospital over the weekend?

> . . .

> [DEFENSE CO-COUNSEL]: He made a request to the jail and they told him to stop playing games, is what he said.

> THE COURT: All right.

> [DEFENSE COUNSEL]: Your Honor, I just think that - - I know. I understand it's him, and possibly his doing, but I think that the jury is obviously not going to understand what's going on. I think they certainly might hold it against him. I can't even explain it to them because I don't even understand exactly what's going on. Again, for those reasons, I am requesting a continuance.

> . . .

> [DEFENSE COUNSEL]: And, Your Honor . . . he's never asked for a continuance of this trial. He's always continued to want to go to trial. I just don't know how I can try a case without - - with someone I can't hear, not going to be able to hear well during the trial. I wasn't able to speak with him over the weekend. Again, that may be his doing. I don't know. I just think that I would be ineffective if I can't communicate with him in this state. I don't feel like I can, during a trial.

8

THE COURT: Well, I think that based on what I've observed, what I've been told from over at the jail, it's Mr. Simms' own doing. Now, he may have some health issues, but I know that he's been taken to the hospital every time he has health issues. I don't believe he has enough health issues to keep him from communicating with you, should he so choose to. And it's his choice whether he wants to sit there like a bump on a log and not help you or not. I can say, if he starts acting up in the courtroom, we'll try the case without him being present in the courtroom, because I do intend this case to go to trial. So the request for continuance will be denied.

During the State's presentation of evidence on the second day of trial, defense counsel advised the trial court at a bench conference that "Mr. Simms' head just hit the table again." Defense counsel asked if she could "take a break to make sure he's okay." The trial court gave the jury a brief recess, during which defense counsel again requested a continuance or, in the alternative, a mistrial:

> Your Honor, at this time based on Mr. Simms' actions and some things that he's said to me in the court, the fact that he's hit his head, I think twice in front of the Jury, once I know of which was just recently. And he's indicated that the reason he keeps hitting his head is because people are pushing his head down into the table.

> Your Honor, I don't know that he's faking anything. I understand that we do have a report that indicates he's competent. I hired a doctor. I didn't have him write a report because he also agreed that he's competent. But we never addressed any physical issues.

> It seems as if - - and this is even starting from Monday, that he's got several physical issues, not just the hemorrhoids that have been noted in jail records, but he's been telling me that his entire left arm hurts up into his neck. Yesterday, he was complaining that his chest hurt. I made sure they weren't chest pains like a heart attack pains.

> But I think, Your Honor, obviously he's got a right to a fair trial. I believe he's being prejudiced. If a mistrial is not granted at this time through no fault of his own, if he has zeros [sic] physical issues - - and again, I have not addressed physical issues. If there is a mistrial, I may need to contact a neuro psychologist, or something like that. And the thing is, if the jail doesn't believe that he's having real physical issues, then their records are not going to reflect any legitimate issues, as it sounds like they don't, it seems like they're just assuming he's faking it.

> But there's no reason to believe that he's faking it. There isn't any documentation that he's faking these physical issues, Your Honor.

9

But again, based on his demeanor in court, particularly his head hitting the table, I am asking for a mistrial. I don't know if he's hurt himself now by hitting his head on the table. It's got to hurt. It's glass and wood.

But for those reasons, Your Honor, I am asking for a mistrial at this time. Or at the very at [sic] least, a continuance to maybe get him to a doctor, seen. And a continuance that I would say, maybe until like noon tomorrow. I don't know how quickly I could get any sort of specialist doctor to come see him.

The trial court denied Simms's requests, finding that he had previously been declared competent to proceed and that there had been no subsequent evidence presented to suggest his condition had changed:

. . . I've had my bailiff check with the jail. As far as the last medical records indicated, he has been taken to the hospital several times at his request and been treated. The only thing the hospital has found, I believe, were hemorrhoids; have found no other physical issues with him whatsoever.

He has been found competent to proceed as far as the psychiatric evaluation and competency evaluation. And I've got no information that he's requested medical care that's been denied. I've got no information that any medical issues had been found to be affecting him.

He appears to be able to communicate with his counsel when he wants to. And I think it's his own choice to act the way that he's acting. I've got no proof otherwise. I've got only proof indicating that as far as medical care and psychiatric care, he is competent, and there are no issues causing him to act the way he is acting. So the request for mistrial and the request for continuance will be denied.

I am willing to grant your request to at least an [sic] adjourn once the State is completed today so you can have an evening to visit with him.

The State called its next witness, and during that witness's testimony, the trial court requested a bench conference with counsel, at which the following exchange occurred:

THE COURT: [Defense counsel], according to the deputies, your client is - - they are holding your client in place as he is continually trying to pitch himself forward. The deputies are holding him and keeping him restrained. So I'm going to have him taken out.

[DEFENSE COUNSEL]: Okay. Are you just going to take him out in front of the Jury or - - I mean, either way they're going to know what happened when they

10

come back in and he's not there. But I think I would prefer it be done outside the presence of the Jury.

A recess was taken, the jury was removed from the courtroom, and the trial court made the following record:

> . . . For the record, I've let the Jury go on a break. It is my intent to remove Mr. Simms from the courtroom. I have been told that a deputy is literally holding him in place and he keeps trying to pitch himself forward out of the seat that he is in. That is unacceptable behavior and it is distracting from the ability of the jurors to listen to the witnesses and observe the evidence that's been presented.

At that point, defense counsel again requested a mistrial; medical personnel were summoned to examine Simms in the courtroom and they found no "emergency situation"; and the trial court denied the mistrial request:

> [DEFENSE COUNSEL]: And, Your Honor, I hear you, and I understand your concerns. Again, I think I need to renew my request for a mistrial. I don't think that his behavior is so outrageous that it is really disrupting the trial, but this just bolsters my concerns for his physical well-being that these things are happening. I don't know if he's pitching himself forward, if he's just falling forward. I understand what your deputy has said, and I believe him, but Your Honor - -
>
> THE COURT: Are you holding him and is he holding against you?
>
> THE BAILIFF: I can let go, but he'll pull.
>
> THE COURT: So he's pulling himself out of your hand?
>
> [DEFENSE COUNSEL]: Your Honor, it's also my understanding that he's shaking right now. You have seen his hand shake. Again, this is - - I understand. I believe I know what is going to happen, but for the record, I would ask for a mistrial.
>
> [PROSECUTOR]: State would be opposed. One cannot create one's own mistrial.
>
> THE COURT: The request for mistrial is denied. It seems Mr. Simms is creating his own issue, and I'm not going to - - I can't grant a mistrial because of that, because I'm not going to have a deputy have to hold him in place when he's trying to pitch himself out of the chair that he's in. He can either not do that and stay in the courtroom, or he can be removed from the courtroom.
>
> [DEFENSE COUNSEL]: [Defense co-counsel's] going to speak with him.

11

THE COURT: And it seems to be a continuing issue this afternoon.

[DEFENSE CO-COUNSEL]: Yes, Your Honor. He appears to be unconscious. He's shaking. He's there and no one is holding him right now and he's not falling out. I think there's been issues with him sliding and falling out of the chair. But as fair as him actively resisting, I've not noticed that or seen that. No one is holding him in the chair right now, but this is - -

THE COURT: He wasn't sliding out of [the] chair. The deputy said that he was pulling against him.

THE BAILIFF: Forward, his upper torso.

[DEFENSE COUNSEL]: Your Honor, if he's become unconscious, that's just one more reason that I ask for a mistrial. Again, I know you've already ruled.

[PROSECUTOR]: Your Honor, I don't know there's any evidence if he's unconscious, as opposed to him sitting there with his eyes closed.

[DEFENSE COUNSEL]: I don't know. I'm not a doctor. I don't know.

He was unable to answer you?

[PROSECUTOR]: He appears to be sitting there, breathing fine, Your Honor. I can see his respiration. It's unclear if he's just sitting there with his eyes closed and refusing to answer questions directed to him.

THE COURT: Does the jail have a medical professional that could come over here to take a look at him?

[Medical assistance was summoned and medical personnel examined Simms in the courtroom.]

THE COURT: We are not finding any emergency situation with Mr. Simms, is that correct?

MEDICAL PERSONNEL: Correct.

THE COURT: I appreciate you all coming over.

Are you all okay with just continuing to hold him in that chair?

DEPUTY: You okay holding him?

[DEFENSE COUNSEL]: I think [defense co-counsel] can help, as well.

THE COURT: All right.

[DEFENSE CO-COUNSEL]: I can keep him close. Right now he's keeping himself up. If I see him start to slide, I can . . .

THE COURT: All right.

The jury returned to the courtroom and the State resumed its presentation of evidence.

The State rested on the second day of trial. The morning of the third day of trial, Simms testified in his defense. Simms stated he heard a knock on the door shortly after arriving home from work on the morning of April 30, 2014. When he opened the door he was "bum rushed" by five black-clad, mask-wearing individuals. They carried guns and told him to "get down." He was lying on the ground with a gun pointed at his head when Boldridge came out of the bedroom. Someone "slapped her down to the ground." The intruders demanded money and searched the apartment. After they found some money, the intruders forced Simms to write a suicide note. Then they took Boldridge into the kitchen and beat Simms unconscious.

Simms testified that he woke up in the closet, but he did not see Boldridge in there with him. One of the intruders was talking on a walkie-talkie and a voice over the walkie-talkie said, "Kill him, too." Simms began to fight someone who had a knife, and he was cut. One of the intruders told another to "[t]ake him out back and shoot him." The intruders took Simms out of the apartment at gunpoint, forcing him to touch door knobs and other items on the way out. They led Simms to the woods behind the apartment complex. Simms was able to knock the gun away from one of the intruders and escape. Simms undressed because "they knew what [he] had on."

Simms ran back to the apartment complex and took Boldridge's car to seek help. His plan was to drive to the house of Boldridge's brother-in-law, Zack, in Liberty, Missouri. Zack worked for "KCPD at the time" and Simms thought Zack could help him. Simms did not know Zack's last name or how to get to his house. Simms got lost and stopped at the home of Scott Hunter to seek

13

help. He did not know why he left Scott Hunter's house before help arrived. Simms then ran out of gas and went "across the street to the bus lot" to get help. He approached a driver of one of the buses and said: "Help, they trying to kill me and my girl." Simms was panicking, thinking "they were still behind [him], after [him]," so he took the minivan and drove away. Simms lost consciousness and drove off the highway in Parkville.

Simms denied having relationship problems with Boldridge and denied seeing her note on the refrigerator. He had no explanation for how his blood and clothes and Boldridge's eyeball came to be in Tony Howard's vehicle. He testified that he did not seek help from officers at the local police station because he did not trust them.

Simms also testified that he did not have any mental health issues "right now" and he was competent.

The jury convicted Simms of first-degree murder, armed criminal action, and first-degree tampering with a motor vehicle. Simms was sentenced to serve life without the possibility of parole for the murder conviction, 100 years for the armed criminal action conviction, and seven years for the tampering conviction, each sentence to run consecutive to the others. Simms now appeals, raising four claims of error.

In his first Point, Simms asserts the trial court abused its discretion in denying his request for a continuance on the first day of trial, prior to jury selection, arguing that he "was suffering from Unspecified Schizophrenia Spectrum and other Psychotic Disorder, had 'refused' to meet with counsel, and was unable to effectively assist in his defense." In his second and third Points, Simms claims that he "was incompetent to stand trial based on mental and/or physical impairments" and therefore the trial court abused its discretion in denying his requests for a

14

continuance or mistrial on the second day of trial.[5] In his fourth Point, Simms asserts the trial court abused its discretion "by overruling [his] objection to the state's repeat questions about whether Mr. Simms attempted to help Michelle," arguing that "there was no legitimate impeachment purpose in asking the argumentative and prejudicial repeat questions."

For ease of analysis, we address Simms's second and third Points together, and we address them first.

**Analysis**

*Points II and III – Competence to Stand Trial*

In his second and third Points, Simms argues he "was incompetent to stand trial based on mental and/or physical impairments"[6] and thus the trial court abused its discretion on the second day of trial by denying Simms's requests for a continuance or mistrial.[7] We reject these claims, finding substantial evidence supported that Simms was competent and he failed to prove otherwise.

"Criminal defendants must be mentally competent to stand trial[.]" *State v. Wise*, 879 S.W.2d 494, 506 (Mo. banc 1994) (overruled on other grounds). "A defendant is competent to stand trial if he has 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and has 'a rational as well as factual understanding of the proceedings

---

[5] Point II relates to Simms's requests for a continuance or mistrial on the second day of trial after he hit his head on the table. Point III relates to his request for a mistrial later that same day, after he appeared to be "pitch[ing] himself" out of his chair. Simms's arguments in Points II and III are almost identical, as are the State's responses.

[6] Simms does not argue or otherwise explain in the argument sections relating to Points II and III how any physical impairment rendered him incompetent to stand trial. Thus, we deem this argument abandoned and do not address it. *See State v. Nunley*, 341 S.W.3d 611, 623 (Mo. banc 2011) ("Arguments raised in the points relied on portion of an appellate brief that are not supported in the argument portion of the brief are deemed abandoned and preserve nothing for appellate review.").

[7] A trial court's denial of a continuance or mistrial will only be overturned if the trial court abused its discretion. *State v. Marley*, 598 S.W.3d 204, 215 (Mo. App. W.D. 2020) (motion for mistrial); *State v. Brown*, 517 S.W.3d 617, 627 (Mo. App. E.D. 2017) (motion for continuance). "Abuse of discretion occurs when the trial court's ruling is clearly against the logic of the circumstances then before it and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Marley*, 598 S.W.3d at 215 (internal marks omitted).

against him.'" *Id.* at 507 (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960)); *see also* § 552.020.1, RSMo Supp. 2018 ("No person who as a result of mental disease or defect lacks capacity to understand the proceedings against him or her or to assist in his or her own defense shall be tried, convicted or sentenced for the commission of an offense so long as the incapacity endures."). "The burden is on the accused to show that he is incompetent to stand trial." *State v. Frezzell*, 958 S.W.2d 101, 104 (Mo. App. W.D. 1998); *see also State v. Anderson*, 79 S.W.3d 420, 432-33 (Mo. banc 2002) ("In Missouri a defendant is presumed competent, and has the burden of proving incompetence by a preponderance of the evidence." (citing § 552.020.8)).

"The trial court's determination of competency is a factual determination that must stand unless unsupported by substantial evidence." *State v. Owens*, 618 S.W.3d 271, 274 (Mo. App. S.D. 2021). "We defer to the trial court's factual determinations without re-weighing the evidence, as the trial court is in the best position to assess the credibility of those testifying and weigh the evidence accordingly." *Id.*; *see also Frezzell*, 958 S.W.2d at 104 ("In reviewing the sufficiency of a trial court's determination of competency, a reviewing court does not weigh the evidence but accepts as true all the evidence and reasonable inferences that tend to support the finding."). We defer to the trial court's factual findings regarding competency because "[f]ace to face with living witnesses the original trier of the facts holds a position of advantage from which appellate judges are excluded." *Maggio v. Fulford*, 462 U.S. 111, 118 (1983) (finding the trial court's conclusions as to competency were supported by the record).

Here, there was substantial evidence in the record to support the trial court's determination that Simms was competent on the second day of trial. Shortly before trial, the trial court ordered Simms undergo a mental examination and, subsequent to that examination, he was found to be mentally competent to stand trial. Specifically, the trial court relied on the report findings that

16

Simms was "clearly able to indicate everybody's roles, clearly competent as far as understanding the proceedings against him, what his attorney was doing, what his options are." Further, "[t]he doctor indicated absolutely no problems with his ability to understand proceedings against him or with his ability to assist in his defense, if he chooses to do so."[8]

Defense counsel procured a second examination for Simms, and that doctor, too, found Simms competent. At defense counsel's request, no report of the second examination was prepared. Thus, the medical evidence supports the trial court's finding that Simms was mentally competent to proceed to trial, and never, at any point in the proceedings below, did Simms present medical records, reports, or other evidence to refute the doctors' findings or otherwise demonstrate he lacked the capacity to understand the proceedings against him or to assist in his own defense. To that end, he never presented evidence to suggest that any change in his condition occurred between the time the doctors found him competent and the second day of trial. And, in fact, medical personnel who examined Simms during trial found no cause for concern. Simms was presumed competent and failed to meet his burden to prove otherwise. *See Anderson*, 79 S.W.3d at 432-33.

Moreover, the trial court was permitted to rely on its own observations of Simms's behavior in finding that "it's his own choice to act the way that he's acting" and he was "creating his own issue." *See State v. Sneed*, 562 S.W.3d 380, 385 (Mo. App. S.D. 2018) (in the absence of proffered evidence showing the defendant was incompetent, "the trial court was left with only its personal observations with which to evaluate Defendant's current mental competency"). From its personal observations and the information and records it received from the jail, the trial court believed Simms was acting under his own volition when he hit his head on the table and attempted to pitch

---

[8] Although Simms did not include the examination report in the legal file on appeal, these were the report findings cited by the trial court on the record at the competency hearing as its grounds for finding Simms competent. We presume the trial court's citations to the examination report are accurate; without the report being part of the legal file, we have no basis to find otherwise.

himself out of his chair. We defer to the trial court's credibility determinations and factual findings in this regard, as "the trial court is in the best position to assess the credibility of those [involved] and weigh the evidence accordingly." *See Owens*, 618 S.W.3d at 274.

Finally, the trial court's determination that Simms was competent is supported by Simms's own trial testimony. During his testimony, Simms was lucid, articulate, and detailed. Simms was cross-examined at length, and his answers were responsive to the questions posed. Moreover, he testified that he was competent. Simms's ability to cogently testify in his own defense provided further support of his competency at trial. *See Sneed*, 562 S.W.3d at 385-86 (the trial court did not abuse its discretion in denying the motion for mental examination where the defendant "remained an active participant in his own defense").

In light of the above, we find the trial court did not abuse its discretion on the second day of trial when it denied Simms's requests for a continuance or mistrial on competency grounds.

Points II and III are denied.

*Point I – Denial of Continuance on the First Day of Trial*

Simms asserts in his first Point that the trial court abused its discretion in denying his request for a continuance on the first day of trial "in that for trial counsel to effectively represent Mr. Simms, trial counsel needed to consult with Mr. Simms prior to and during trial, but at the time of trial, [he] was suffering from Unspecified Schizophrenia Spectrum and other Psychotic Disorder, had 'refused' to meet with counsel, and was unable to effectively assist in his defense." However, these were not the grounds for a continuance asserted by Simms to the trial court, either at the time the continuance was requested or in his motion for new trial. Rather, Simms asserted in his motion for new trial that:

> This Court erred in not granting Defense counsel's request for a continuance on the
> morning of trial due to Mr. Simms [sic] obvious medical issues. Mr. Simms was in

18

a wheel chair and was unable to stand, his neck and shoulder was in so much pain he could not keep his head up and he had fallen recently in the jail and hurt his head. Mr. Simms could barley [sic] keep his eyes open. The Court's decision not to grant a continuance violated defendant's right to due process of law . . . .[9]

"In order to preserve an error for appellate review, an objection stating the grounds must be made at trial, and the same objection must be set out in the motion for new trial and must be carried forward in the appellate brief." *State v. Ratliff*, 622 S.W.3d 736, 745 (Mo. App. W.D. 2021) (internal marks omitted). Thus, Simms's specific claim on appeal relating to the trial court's denial of his motion to continue on the first day of trial—which was not raised to the trial court—was not preserved and can only be reviewed for plain error. *See State v. Fassero*, 307 S.W.3d 669, 674-75 (Mo. App. E.D. 2010) (the defendant's claim on appeal that the trial court erred in denying his motion to continue was reviewable solely for plain error because the defendant asserted a different basis for the continuance in his motion for new trial). Under plain error review, we reverse only if we find the trial court committed an "evident, obvious, and clear error that facially establishes substantial grounds for believing that manifest injustice or a miscarriage of justice has occurred." *State v. Campbell*, 600 S.W.3d 780, 788-89 (Mo. App. W.D. 2020) (internal marks omitted). We find no such error occurred here.

Simms first asserts on appeal that he was entitled to a continuance because he "was suffering from Unspecified Schizophrenia Spectrum and other Psychotic Disorder." However, Simms's diagnosis was not grounds for continuing the trial in light of the trial court's finding that Simms was competent to proceed. *See Frezzell*, 958 S.W.2d at 104 ("The actual presence of some degree of mental illness or need for treatment does not necessarily equate with incompetency to stand trial."); *see also Hubbard v. State*, 31 S.W.3d 25, 33-34 (Mo. App. W.D. 2000) (upholding

---

[9] The arguments defense counsel made to the trial court in support of Simms's request for a continuance on the first day of trial are consistent with the claim raised in his motion for new trial.

the lower court's judgment finding that the defendant "had a mental disease or defect, but this mental disease or defect did not cause him to lack the capacity to understand the proceedings against him or to be unable to assist in his own defense" and thus he was competent). As discussed above, the trial court's finding that Simms was competent was supported by substantial evidence—including the opinions of two experts and the trial court's personal observations—and Simms failed to prove that a mental disease or defect rendered him incompetent to stand trial. Thus, he was not entitled to a continuance by virtue of suffering "Unspecified Schizophrenia Spectrum and other Psychotic Disorder."

Simms next argues that a trial continuance was warranted because he "had 'refused' to meet with counsel." Yet Simms does not explain how his "refus[al]" to meet with counsel the weekend before trial deprived defense counsel the ability to effectively represent Simms or prepare for his trial, especially given the extensive period of time between the date Simms was indicted (September 2, 2014) and went to trial (October 21, 2019).[10] Further, the trial court found, "based on what [it had] observed, what [it had] been told from over at the jail," that Simms's refusal to speak with defense counsel before trial was "Simms' own doing."[11] The trial court was not required to condone or endorse Simms's delay tactics by granting a continuance the morning of trial. *See State v. Solomon*, 7 S.W.3d 421, 427 (Mo. App. S.D. 1999) (a trial court is not obliged to reward the defendant for his own misconduct); *cf. State v. McGinnis*, 441 S.W.2d 715, 718 (Mo. 1969) (noting that the declaration of a mistrial in the event of improper behavior by a defendant in a

---

[10] We recognize that this extended period was due, in part, to defense counsel's serious illness; however, beginning in 2017—two years before trial—defense counsel's requests for continuance were founded on reasons unrelated to her personal health.

[11] Defense counsel conceded to the trial court that her inability to speak with Simms over the weekend "may [have been] his doing."

criminal proceeding "would be an open invitation to any defendant to engage in [misconduct] and thereby prevent his trial from reaching a conclusion").

Finally, Simms argues that he was entitled to a continuance because he "was unable to effectively assist in his defense." In support of this claim, Simms asserts "[t]he circumstances of [his] continuance request" were similar to those in *State v Brown*, where the Eastern District of this Court found the trial court abused its discretion in denying the defendant's request for a trial continuance. *See* 517 S.W.3d 617, 631 (Mo. App. E.D. 2017). We disagree. The defendant in *Brown* cited to a specific defense he was unable to prepare for and present at trial absent a continuance, and the record supported his claim.[12] *See id.* at 629-30. Here, on the other hand, Simms does not point to any defense he was unable to present at trial or any deficiency in his defense that would have been cured by additional time with counsel. Further, the fact that Simms testified extensively in his own defense belies his claim on appeal that he was "unable to effectively assist in his defense."

We find the trial court did not err—let alone commit an evident, obvious, and clear error—in denying Simms's request for a continuance on the first day of trial.

Point I is denied.

*Point IV – Questioning Simms on His Efforts to Help Boldridge*

In his fourth Point, Simms argues the trial court abused its discretion "by overruling Mr. Simms' objection to the state's repeated questions about whether [he] attempted to help

---

[12] The defendant in *Brown* "claim[ed] he was unable to prepare for and present the defense of mental disease or defect" and "the record reveal[ed] [Brown's] attorneys were unable to prepare for and present the defense of mental disease or defect excluding responsibility because [Brown] failed to communicate with his attorneys and failed to participate in mental health evaluations with doctors." 517 S.W.3d at 629-30. Unlike the defendant in *Brown*, Simms *did* undergo pre-trial mental evaluations and was found to be competent. Moreover, in *Brown*, unlike here, the defendant was evaluated by three doctors after the trial, two of which found him incompetent, and all three of which determined he was not feigning his symptoms. *Id.* at 624-26, 632.

21

[Boldridge] . . . in that the state's own witnesses testified that Mr. Simms had asked for help, so there was no legitimate impeachment purpose in asking the argumentative and prejudicial repeat questions."[13]

In two instances on cross-examination, the State questioned Simms—without objection—about his attempts to help Boldridge:

Q. Well, did you do anything at all to help Michelle?

A. Trying to get help.

Q. What were you getting help for?

A. For me and Michelle, some people trying to kill us.

Q. You didn't do a very good job, did you?

A. No, sir.

Q. You didn't really even try, did you?

A. I tried.

Q. You tried by going as far away as possible, to an address you don't know, to a person you only know their first name. That was your attempt, correct?

A. Trying to get help from a family member.

. . .

Q. And you didn't tell anybody that Michelle needed help then, did you? All you told them, you're saying the people were after you, but you didn't say Michelle needed help, did you?

A. Yes, sir, I told them.

When the State asked Simms a third time, defense counsel objected on the grounds of "asked and answered," and the objection was overruled:

Q. And to be clear, you don't do anything to help Michelle, have you?

---

[13] We review the trial court's decision to admit or exclude evidence for abuse of discretion. *State v. Williams*, 409 S.W.3d 460, 471 (Mo. App. W.D. 2013).

22

[DEFENSE COUNSEL]: Objection, Your Honor. Asked and answered several times.

THE COURT: Overruled.

Q. You didn't do anything to help Michelle, did you?

A. Trying to get help for both of us.

Q. And tell me what you did to get help.

A. Told the people that was in the apartment complexes, told them, those people. Told the bus driver. Told the neighbor. Told the person that got out the car everyone that I came across, I told them what was going on.

Although Simms asserts the State's questioning "served no legitimate purpose," we disagree, as Simms's efforts—or lack thereof—to seek help for Boldridge were probative of whether he deliberated before killing her. *See State v. Strong*, 142 S.W.3d 702, 717 (Mo. banc 2004) (In a first-degree murder case, "failure to seek medical help for a victim strengthens the inference that the defendant deliberated."). Additionally, the State was entitled to question Simms regarding his specific efforts to help Boldridge in an attempt to impeach Simms's testimony that he was seeking help when he took Boldridge's car and drove away from the scene of the murder. *See* § 546.260.1, RSMo 2016 (a criminal defendant who elects to testify is subject to cross-examination "as to any matter referred to in his examination in chief, and may be contradicted and impeached as any other witness"). We find the trial court was well within its broad discretion to allow this evidence. *See State v. Mays*, 501 S.W.3d 484, 488 (Mo. App. W.D. 2016) ("The trial court has broad discretion in ruling on the admissibility of evidence.").

Moreover, we find Simms suffered no prejudice from the questioning at issue, as it was cumulative to his previous testimony. *See State v. Kemp*, 212 S.W.3d 135, 145 (Mo. banc 2007) (We review the trial court's decision to admit evidence "for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial."). Simms

testified extensively on direct examination about his efforts to seek help, stating that he asked for help from neighbors in the apartment complex, Scott Hunter, and a woman in the bus barn. Simms's direct-examination testimony was that he told his neighbors and the woman in the bus barn: "They trying to kill me and my girl." The State elicited testimony from Simms on cross-examination—without objection—that he was seeking help for himself and Boldridge after he left the apartment complex. Simms's response to the complained-of question here was cumulative to his previous direct- and cross-examination testimony on this issue, and we find Simms was not deprived of a fair trial by repeating this testimony one more time. *See Mays*, 501 S.W.3d at 490 ("When there is other evidence before the court which establishes the same facts, no prejudice is shown." (internal mark omitted)).

The trial court did not abuse its discretion in overruling Simms's "asked and answered" objection and allowing the State to question him about his efforts to help Boldridge, nor did Simms suffer prejudice as a result.

Point IV is denied.

## Conclusion

The judgment of the trial court is affirmed.

_____
EDWARD R. ARDINI, JR., JUDGE

All concur.

24